EDGAR C. DOWNS and ELLA DOWNS, by their guardian JOSEPH C. DOWNS,

*vs.*

WILLIAM W. RICKARDS, THOMAS H. DENNY administrator of JOHN DENNY, deceased, PATRICK LYONS and STEPHEN M. COLLINS, Sheriff.

*Kent, Mch. T. 1872.*

A guardian is not a mere debtor to his ward, at liberty to deal with the fund as if it were money borrowed, and so to subject it to all the hazards of business or speculation. He is a trustee, holding a fund, not his own, which it is his duty to keep separately invested, in his name as trustee, free from all risks affecting his own affairs. And his omission to do this is a gross breach of trust.

A guardian becoming the purchaser, at the sale under order of the Orphans' Court, of his wards' lands, takes it subject to a constructive trust for the wards.

The circumstances that he accepted the guardianship with the view of enabling himself to purchase the land without paying the purchase money, until the majority of the wards, and that he filed a petition stating that the purchase money was in the hands of the trustee appointed to make the sale, when in fact it was not, are sufficient to raise the inference of actual legal fraud.

The principle upon which the disqualification of a trustee, to buy the trust estate rests, is a very broad one and extends as well to sales conducted by others as to those conducted by himself.

The rule that a trustee shall not purchase the trust property is one of the widest application, applying not only to trustees in the strict technical sense, but to all persons holding fiduciary, confidential relations.

The prohibition against the purchase of trust property by a trustee does not depend upon any question of fraud, but is made absolute to avoid the possibility of fraud.

In this Court no sale to a trustee of the trust property during the continuance of the trust, however fair the terms, will be permitted, whether the sale be one made by the trustee himself or a judicial sale made by another person, subject to the exception, if such it be, of a perfectly fair dealing between the trustee and a *cestui qui trust* who is *sui juris* under such circumstances as amount to a termination of the trust relation between them.

Interrogatories seeking a witness' knowledge of general facts should be preceded by an inquiry whether he has such knowledge, and if so, how he obtained it.

Insolvency is a general fact and may be proved by general reputation established by witnesses having knowledge of it, but the opinion of the witnesses cannot be given.

It is competent to prove by parol the application of the proceeds of a sale of lands under execution.

The existence and contents of judgments and levies cannot be proved by parol, but such evidence may be received as to when a judgment was paid, or that the payment was in fact made since what purports to be the date of the entry of satisfaction.

BILL IN EQUITY AGAINST A GUARDIAN BY HIS WARDS.—At the March Term of the Orphans' Court, 1867, an order was made for the sale of certain real estate of the complainants, Edgar C. Downs and Ella Downs, infants, by Elias S. Reed, Esq., as trustee of the Court. On the 29th June, 1857, the real estate was exposed to

53—DEL. CH. IV.

sale by the trustee and bid off by Henry Downs at $3750. The sale was returned to the Orphans' Court on the 31st October, 1867, as having been made to William W. Rickards the principal defendant, he having in the meantime by an arrangement with with Henry Downs, the bidder at the sale, agreed to be returned as the purchaser. The sale was confirmed by the Court and title duly conveyed. Rickards, was at the return of the sale on the 31st October, the guardian of the children, having been appointed by the Orphans' Court on the 27th September, 1867. He gave as his surety in the guardian bond, Isaac G. Lofland. At the date of the bond both the guardian and the surety held considerable real estate, subject, however, to a large amount of liens. Within the three following years both became and still are insolvent. Their real estate was all levied on and sold by the Sheriff leaving debts still unpaid. The real estate of the Downs minors purchased by Rickards was also exposed to sale by the sheriff under execution at suit of John Denny's administrator, one of the defendants, and was bid off at the sale by Patrick Lyons another of the defendants at $1725.00. At this stage of the proceedings, before the return of the execution, this bill was filed on behalf of the complainants, the infants, by their next friend, and an injunction was issued to restrain further proceedings under the execution. The relief prayed by the bill is that the lands be decreed to be held by Rickards subject to a constructive trust in favor of the complainants—such a trust having arisen, as the bill insists, first, out of actual fraud practiced upon the Court in obtaining the title, and second out of the fact that Rickards was guardian of the minors at the time of the purchase and as such disqualified to take the title, even in the absence of actual fraud to their prejudice. The facts mainly relied on to establish a case of fraud were that the guardian knew of his and the surety's insolvency when the guardian bond was given so that he imposed upon the Court a security

known to be worthless or which at least he had reason to believe was such—also that he deceived the Court in representing that he had paid the purchase money to the trustee, contrary to the fact, whereby he obtained an order on the trustee for the payment of the money over to himself as guardian. In point of fact but a small part of the purchase money had been paid by Rickards as the purchaser to the trustee and the settlement between them was for almost the whole purchase money made by passing receipts. No money was raised and invested by the guardian as a separate trust fund for the minors, consequently upon the insolvency of the guardian and of his surety, the minors were left without relief other than such as this bill sought for them by affecting the land with a constructive trust. The creditor under whose judgment the land was struck off at the Sheriff's sale, the administrator of John Denny by his answer admits that he has been otherwise satisfied and disclaims any interest in this suit. Patrick Lyons, the bidder at the Sheriff's sale also files a disclaimer ; so that the question of relief rests between the complainants and the defendant, Rickards, unaffected by the claim of any third parties.

The answer admits the general course of procedure as set forth in the bill touching the sale and its return and confirmation ; but, it denies the alleged insolvency of Rickards and Lofland and all the charges of fraud made by the bill, alleging that the guardianship was not sought but accepted by Rickards at the solicitation of the mother of the minors, who was his sister by marriage, solely for their benefit and without any view to the purchase of their land. That he made the purchase in good faith. And the answer submits that under all the circumstances no equity arises in favor of the minors. A large mass of testimony was read on both sides bearing mainly on the question of the solvency of Rickards and Lofland at the date of the guardian bond. The testimony so far as it is deemed material, is stated in the opinion of the Court.

BEFORE THE CAUSE was ready for hearing, exceptions were taken to several of the interrogatories filed, to be propounded to the complainants' witnesses.

Among the interrogatories excepted to where the following :—

2. How long have you known William W. Rickards, one of the respondents? Was he or not embarrassed in his circumstances in the month of September, A. D. 1867? Was he not considered greatly embarrassed in his circumstances before and at that time? Has he not been regarded as unable to pay his debts for some years, and how long has he been so regarded? Was he regarded in the community as a man in failing circumstances at the date above mentioned, or about that time? Did you so regard him? Was he considered insolvent at that time, or very soon after, and was that your own opinion of his circumstances? Would you have given him credit or trusted him without security for any amount of money? Would you have loaned him money with Isaac G. Lofland as surety?

3. Do you know of any judgments against William W. Rickards in the Superior Court, entered prior to September the 27th 1867, and unsatisfied at that date ; and if so what was the amount of said judgments? Was there an unsatisfied judgment at that date against him in favor of Sophia M. Rickards ; what was the real debt therein and the date of entry? Was there a judgment at that date unsatisfied against him in favor of John Denny (since dec'd) and when was it entered, and what was the real debt of such judgment? was there a judgment at that time (September 27, 1867) against said Rickards in favor of Patrick Lyons ; and what was the real debt thereof and the date of its entry? Has the last named judgment been since paid out of the proceeds of sale of lands of Isaac G. Lofland, the surety therein? Was the said judgment assigned to the surety and is it still open and unsatisfied against Rickards? Is there a judgment against said Rickards in

favor of James M. Smith ; and when was it entered , and what is the real debt thereof? Is the last named judgment still unsatisfied ? Have you in your possession a list of unsatisfied judgments in the Superior Court against William W. Rickards ? if so, append said list to your testimony and make it a part of your evidence.

4. Do you know of any mortgages against said W. W. Rickards? and if so, state the date of such mortgage and the amount of the debt it secures.

5. Do you know of any other indebtedness of the said Rickards at the time mentioned in the third interrogatory ? If so, state what you know about such indebtedness. Do you know of any judgments entered against said Rickards soon after the date aforesaid ? if so, state in whose favor they are, and the amount of such judgments.

7. Do you know whether any constable or other officers were pressing said Rickards for money in 1867, and before or after that time ? If so, state what you know about it.

9. Did you ever hear William W. Rickards say that if he could be appointed guardian for the complainants, he would buy and have a long time to pay for their lands? State what you heard him say about it. Did he ask you to be his surety in the guardian bond, and did you refuse; and why did you refuse ?   Did you think him insolvent at that time ?

11. Do you know, if so state what lands William W. Rickards owned in September, 1867 ?   Had he or not sold to James W. Smith a part of the lands that his father once owned before that time ?   Were not the same lands, and all other lands that formerly belonged to his father, sold, since that date, to satisfy a mortgage resting against it at the time he conveyed to said James W. Smith ? Who sold said lands as sheriff, or any part of said lands, and

how much did the lands sold by Sheriff Hargadine bring, and to what the proceeds were applied?

12. Did Stephen M. Collins, as Sheriff of Kent county, sell a house and lot belonging to said Rickards at Hall-town, and if so, state, if you know, when it was sold, how much it brought, and to what liens the proceeds were applied?

13. Are you a director in any bank in this State? If you answer yea, please state in what bank you are a director, and whether in your opinion, the note of William W. Rickards, with Isaac G. Lofland as indorser, would have been discounted if offered for discount in the month of September, A. D. 1867, in your bank? Would Lofland's note with Rickards as indorser have been discounted? Would such paper have been refused because not considered at that time good? Had both Rickards and Lofland, for a long time before that date, been regarded as unable to pay? Did your bank discount a note in April, 1868, of Isaac G. Lofland with Henry G. Cooper as indorser? Did you discount it with the understanding with Mr. Cooper that he would be expected to protect it? Would it have been discounted without such an understanding? Did Lofland or Cooper pay it?

14. How long have you known Isaac G. Lofland? Was he not largely indebted and greatly embarrassed in his circumstances in the month of September, A. D. 1867? Was he considered greatly embarrassed in his circumstances before and since that time? Did you so regard him at the time mentioned? Have you any knowledge of the amount of judgments and other liens entered against him prior to the 27th day of September, A. D. 1867? if so, state the amount of judgments, mortgages and recognizances against him at that time. Was he in your opinion insolvent at that time?

15. Did you ever loan Isaac G. Lofland money? If

so state the amount and the time when the loan was made and the circumstances under which you loaned him the money. Did you know his circumstances when you loaned him the money? Has the money ever been paid? Was he at that time greatly indebted, and when and how did you learn that his circumstances were embarrassing? Did you search the records for judgments and other liens against him? if so, state about what time you searched and the amount you found against him. Would you have loaned him money at that time if you had known his circumstances?

16. Have any of the lands of Isaac G. Lofland been sold by Samuel Hargadine, Sheriff of Kent County, and what part of his lands were so sold? When were his lands sold and what was the amount they brought? To what judgments or other liens were the proceeds of sale of his lands applied? Was any part of the proceeds of sale applied to judgments or other liens entered since September 27, 1867?

17. Have all the lands of Isaac G. Lofland not already sold been levied upon and taken in execution? What lands of his have not been sold? Has Henry C. Cooper a mortgage for purchase money on his farm near Halltown? What is the amount of his mortgage? What, in your opinion will the farm bring at public sale? What in your opinion will the small tract near Halltown, formerly the property of William Hall, bring at public sale? Is there a recognizance of Isaac G. Lofland in the Orphans' Court, which is for purchase money as a part lien against this tract? About what is the amount of this recognizance? What are all his other lands levied upon worth? Please state your estimate of each parcel. Have you a certified list of unsatisfied judgments entered in the Superior Court against Isaac G. Lofland in your possession? if so, append it to your deposition as a part of your evidence.

The objections taken sufficiently appear from the

opinion of the Chancellor, being to leading questions, to the admission of parol evidence, as to the judgments inquired about, and as to the proof of reputation for insolvency.

*E. Saulsbury*, for the complainant.

1. Leading quesuions, are, in some cases, necessary to elicit the facts.

2. Parol evidence as to the judgments is admissible, though not the best. It may be the only evidence attainable, as when satisfaction now appears, we must be at liberty to show at what time the satisfaction was entered. We wish to show that the judgments were not satisfied at the time of the guardian's appointment and the actual date of satisfaction. Also the time at which the *fi. fa.* was returned settled.

In some cases, the record does not show the application of the proceeds. Even if the Sheriff's return is held to show the application of the proceeds, may not the Sheriff prove to whom, in point of fact, he paid certain money, and when?

*Ridgely*, for the defendant.

Any question which suggests the answer, must be held to be objectionable as leading. Reputation for insolvency may be shown, but not the opinion of one man. I admit that parol proof may be made when a certain judgment was in fact paid or satisfaction entered, but this is the limit of inquiry.

THE CHANCELLOR :—

The second interrogatory is objectionable because it is leading, but it also inquires, as do the 13th and 14th and the last clause of the 9th, as to the opinion of the witness

about the defendant's insolvency.  This should be omitted and the questions confined to the witness's *knowledge* of the defendant's insolvency, not his opinion.  It may also extend to general reputation.  The proper form requires preliminary questions, such as, "Did you at such a date know Rickards' reputation in his neighborhood for solvency, and how ? if yea, what was it ?"

The fourth interrogatory is objectionable as inquiring as to the existence of mortgages, and the third and latter clause of the fifth, as attempting to prove the existence and contents of judgments on September 27, 1867.  This cannot be done by parol, nor by a list unless duly certified.  The record is the only evidence.

The object of the third interrogatory suggested in argument, was to prove that these judgments were paid since that date, and that certain entries of satisfaction though purporting to be made before, were in fact made since that date.  This is admissible under interrogatories differently framed. · They should inquire of the witness at what time a certain judgment (describing it) was paid ?  If yea, how he knows it? at what time it was paid? by whom ? &c., whether before September 27, 1867 ?

Whether he knows when a certain entry of satisfaction (describing it) was made and signed on the record ?  If yea, how he knows ?  And when it was made and signed ? ·Whether since September.27, 1867?

The first clause of the fifth interrogatory should be answered so as to make the inquiry as to indebtedness on September 27, 1867, for which judgment had not been recovered.

The seventh interrogatory is not wholly objectionable, but is defective in not first eliciting whether the witness has any knowledge and how he obtained it.

The eleventh, twelfth and sixteenth interrogatories
54—DEL. CH. IV.

are admissible, but not sufficiently specific. The inquiry should be in the first instance, were you sheriff &c.? How did you dispose of the proceeds of sale? Did you apply them in payment of any, and what liens against the premises sold? Did you apply any and what part of the same to such a lien or liens? (describing it or them.)

The seventh interrogatory is inadmissible as far as it inquires about mortgages and recognizances—They being matters of record—so also, the inquiry as to all unsold lands being levied on. The witness may be asked to state what lands Lofland holds, so far as he knows, and the levies must be proved by the record. The request to append to the deposition a certified list of liens is unobjectionable in the terms asked. If properly certified, it would be evidence by itself, if not, it would be subject to exception after publication.

Leave will be given to amend those interrogatories which are objectionable in form and not as to the subject of inquiry.

The interrogatories were amended and the cause proceeded to a hearing.

*E. Saulsbury*, for the complainants.

There are two grounds of relief.

*First.* Actual fraud. The proof shews that Rickards sought the guardianship as a fraudulent artifice for getting the land and not for the benefit of the children. This is indicated by several circumstances. His active efforts to have himself substituted for the purchaser—his anxiety to be appointed guardian—his efforts to that end while bankrupt in fortune—his presenting to the Court a surety in failing circumstances.

Silence or non-disclosure, where disclosure is a duty, especially under a fiduciary relation amounts to fraud. *Perry on Trusts, Secs.* 169 *and* 178.

He took the lands after his *appointment*, while guardian, thereby gaining an unconscientious advantage. It was then his special duty to guard the interests of the wards in this land or its proceeds ; such would have been his duty as a third person, *a fortiori* as against himself.

His not paying for the land was itself a fraud ; by that the wards lost the advantage of following the trust fund wherever it might be traced.

But beyond this he falsely represented to the Court, that the money was in Mr. Reed's hands, when is was not.

In equity, fraud may be presumed from the relations of parties, and its absence must be shewn in defense. 1 *Sto. Eq. Jur. Sec.* 190 ; 1 *Fonbl. Eq.* 124, *note* (*b*) ; 3 *Gr. on Ev. Sec.* 254 ; *Harrison vs. Guest*, 35 *E. L. & Eq.* 487.

Equity will relieve against decrees obtained by fraud. *Reigal vs. Wood*, 1 *Johns. Ch.* 402 ; *Sterry vs. Arden*, 1 *Ib.* 269 ; *Bottsford vs. Burr.* 2 *Johns. Ch.* 412 ; 2 *Sm. L. Cas.* (449) ; *Shedden, vs. Patrick*, 28 *E. L. and Eq.* 56 ; *Browne on Frauds Sec.* 95.

*Second.* It is also a case of constructive fraud.

(1.) The purchase was inconsistent with his duty as guardian, and was therefore precluded on grounds of public policy. *Van Epps vs. Van Epps*, 9 *Paige* 237; *Greenlaw vs. King*, 3 *Beav.* 49.

(2.) He did not in fact pay for the land and there is consequently a resulting trust. 14 *Pick.* 271 ; 10 *Pa. St.* 618, 626, 630 ; 30 *Maine* 136 ; 1 *Johns. Ch.* 582.

(3.) Whenever one holding a fiduciary character makes a purchase with trust funds, a trust results. *Perry on Trusts Secs.* 127 ; 35 *E. L. & Eq.* 48.

Taking the land without paying for it is equivalent to buying other land with these trust funds. *Hamburg Bank*

*vs. Tyler*, 3 *W. & S.* 373, 377 ; 11 *Hump.* 457 ; 2. *S. & R.* 531 ; 1 *Clarke (Iowa)* 226 ; 1 *Strobh. Eq.* 96 ; 49 *Pa. St.* 410 ; 2. *Sugd. on Vend.* 362.

(4.) If a person in a fiduciary relation uses his position to purchase with his own funds an interest in trust property or other property so connected as to be used with it, he must hold subject to the trust. *Perry on Trusts, Secs.* 127 *and* 200 ; *Van Epps vs. Van Epps*, 9 *Paige* 246 ; *Clary vs. Bank of Orleans*, 9 *Pa. St.* 663 ; *Greenlaw vs. King*, 3 *Beav.* 49 ; 2 *Sto. Eq. Jur. Sec.* 1261-5 ; 4 *Cow.* 739 ; *Farman vs. Brooks*, 9 *Pick* 212, 231-4 ; 55 *Pa. St.* 110.

*Ridgely* and *Massey*, for the defendants.

The bill suggests but two grounds of relief :—

One of actual fraud in the transaction in the Orphans' Court where it is claimed a trust was raised in equity, and the other that the defendant as guardian had purchased the land with trust funds and hence there was a resulting trust. We agree that either of these grounds bring the case within the principles relied on.

With respect to the claim of actual fraud, however, the fraudulent intention must be established conclusively, and upon the proof in this cause it is not. So also it appearing upon an examination of the evidence that this is not a case of funds in the hands of Rickards which can be identified and followed, with which he purchased the land.

As to the claim of a resulting trust ; such a trust can only arise in two cases, (1) on a purchase of land with the money of another, and (2) when the transaction is fraudulent and the party is held to be a trustee *ex delicto*.

We admit that Rickards would not have taken title had he sold, but when he contracted with Downs he was not guardian. The land had been converted before his

appointment, and having contracted before his appointment he was bound to comply.

The validity of the sale was established by the confirmation of the Orphans' Court after his appointment. He had no rights or duties touching the real estate ; at his appointment, the wards held no real estate, under the effect given to these sales.

Upon the facts proved this case does not fall within any class of resulting trusts. *Fisk vs. Sarber*, 6 *W. & S.* 18; 2 *Sto. Eq. Jur. Sec.* 1261 ; *Kellum vs. Smith*, 33 *Pa. St.* 158 ; *Barnett vs. Dougherty*, 32 *Pa. St.* 371 ; *Darling vs. Hammer*, 5 *C. E. Green Ch.* 220; *Torry vs. Bank of Orleans*, 9 *Pa. St.* 663 ; *Eberts vs. Eberts*, 55 *Pa. St.* 110 ; *Baker vs. Vining*, 30 *Maine*, 121.

There can therefore be no resulting trust and the case resolves itself into the single question of fraud in the giving of the guardian bond.

We are not bound to shew the absence of fraud which is never presumed.   True it may be inferred from circumstances but these must be well established and conclusive. *Duval vs. Cole*, cited, 1 *Md. Chy. Dec.* 169.


THE CHANCELLOR :—

In this case, I am of opinion that the land sold as the property of the Downs minors, and purchased by the defendant Rickards, is, in equity, subject to a constructive trust for the minors.   My opinion rests upon two distinct grounds. *First.* Excluding from consideration all question of actual fraud on the part of Rickards in obtaining the title, still, the case is left within the rule that a trustee shall not purchase property held by him in trust, so long as the trust continues.   The disability of a trustee to buy at a sale conducted by himself, has never been doubted ; but it has been questioned whether he might not purchase at a judicial sale of the trust estate made by some

other officer or person, and not subject to his control. The principle upon which the disqualification of the trustee to buy the trust estate rests, is a very broad one, and extends, as well to sales conducted by others, as to those conducted by himself. The principle is that one shall not act for himself in any matter with respect to which he has duties to perform or interests to protect for another. The trustee of real estate, which happens, during the continuance of the trust, to fall under some judicial process of sale, such as execution process, sale in bankruptcy, or, as in this case, an order of the Orphans' Court, stands in this position. Though he has not the management of the sale, he has in charge the interests of the *cestui que trust*, as they may be affected by the sale, and standing in the place of his *cestui que trust*, he is not allowed to act for himself. The principle looks, not merely to prevent fraud in the management of the sale, but to the broader object of relieving trustees from any possible conflict between duty and self interest.

The rule is one of the widest application. It applies, not only to trustees, in the strict technical sense, but to all persons holding fiduciary confidential relations, such as assignees in bankruptcy, executors and administrators, attorneys and solicitors, and with the greatest stringency to guardians. 1 *Story's Eq. Jur. Secs.* 321, 322 ; 2 *Sugd. on Vend. Ch.* 19, *Sec.* 2, *par.* 1. The prohibition does not depend upon any question of fraud or improper advantage made by the purchase. However fair the sale, and adequate the price, the Court will set it aside. In view of the difficulty of unraveling fraud in these transactions, the policy of the rule is, to exclude the possibility of it by making the prohibition absolute. It is hardly an exception to this remark that the trustee has been allowed to deal directly with a *cestui que trust* who is *sui juris* under special and guarded circumstances amounting to a dissolution of the relation between them. 2 *Johns. Ch. R.* 376

The principle which excludes, as a purchaser, any person owing any duty to another touching the subject-matter of a sale, though a sale not conducted by himself, has been most fully discussed in a series of cases of sales in bankruptcy, where purchases by assignees, by commissioners and by solicitors in bankruptcy have been drawn into question. A series of such cases came before Lord Eldon, who gave the subject a very thorough examination. One of these cases is *Ex parte James*, 8 *Ves. Jr.* 337. Upon a sale of the bankrupt's estate by the assignees, it was bid off by the solicitor of the assignees. The sale was treated by Lord Eldon as fairly made, and no undue advantage gained by the solicitor. Yet he would not allow the sale to stand, holding the solicitor to be within the principle of the rule which excluded the assignees themselves from purchasing ; and this, upon the ground that the solicitor, as the adviser of the assignees, was under a duty to them, and through them to the creditors and the bankrupt, incompatible with the relation of a purchaser. Nor, would the Lord Chancellor, in that case, on directing a re-sale discharge the solicitor in order that he might be at liberty, afterwards, to bid, since such a practice might enable one who, from a confidential relation to the property, had acquired special information touching its value to make a selfish use of it by getting a discharge instead of disclosing his knowledge for the advantage of the sale. He took in this case the strong and clear ground that, considering the difficulty in a Court of Justice of detecting fraud, and the general unfitness of *cestuis qui trust* to look after their interests in these transactions, the fidelity of the trustee should be secured by an absolute prohibition to purchase at all. In another case, soon after, *Ex parte Bennett*, 10 *Ves. Jr.* 381, upon a very elaborate examination, the same principle was applied to a sale, at which one of the Commissioners of the bankrupt, bid off the property for an absent person, that person being himself a competent purchaser. Lord Eldon held that the

Commissioner could neither buy for himself nor for a third person. It should be observed here, that a Commissioner in bankruptcy had, as is fully stated in the case now cited, no control or management of the sale, that being vested by the statute of bankruptcy in the assignees. The Commissioner in bankruptcy held substantially the same relation to such sale as does the guardian to a sale by a trustee appointed by the Orphans' Court. Neither of them have any direct agency in, or control over, the sale, but both represent, generally, the interests involved in it, that is, the Commissioner represents the interests of the creditors, and the bankrupt and the guardian represent the interest of the infants ; and both are to receive and dispose of the proceeds of the sale. In another case, prior to the two just cited, *Ex parte Hughes*, 6 *Ves. Jr.*, 617, Lord Eldon held it extremely difficult, though the case did not require a decision of that point, to sustain the title of one of the creditors of the bankrupt, who, having been consulted and having advised as to the mode and terms of sale, afterwards bid off the property, although without any fraud or bad faith. Lord Eldon, in laying so strong a hand as he does in these cases, upon all persons connected with proceedings in bankruptcy, was, doubtless, stimulated by his observations of the tendency to fraudulent practices in dealing with estates in bankruptcy, upon which tendency he comments in some of the cases before cited, and with still greater severity in 6 *Ves. Jr.* 1. But the view taken by him in these cases equally apply to all persons holding fiduciary relations with respect to property subject to sale, and to none with more force and importance, as we shall presently see, than to guardians. And accordingly, the principle under consideration has received from the Courts the widest application. The views of Lord Eldon came under direct review in a later English case, *Greenlaw vs. King*, 3 *Beavan* 49. There the rector of a parish was authorized by act of Parliament, to raise, by the sale of an annuity,

£2000 for rebuilding the rectory. The sale of the annuity and the disposal of the proceeds were to be subject to the approval of the Bishop of the Diocese.    Upon an effort being made, without success, to obtain the required sum, at a percentage deemed low enough, the Bishop proposed, himself, to purchase the annuity at $8\frac{1}{3}$ per cent. provided the rector could not obtain the money at a lower rate. No better offer being made, the annuity was sold to the Bishop.    Upon a bill to set aside the sale, it was held by Lord Langdale, M. R., and affirmed by Lord Cottenham on appeal, that the transaction, although confessedly fair and honorable on the part of the Bishop, was yet one prohibited by the rules established and necessary for the protection of interests committed to those holding fiduciary relations, and therefore could not stand.    The Master of Rolls. (*p.* 61) quotes, with strong approval, Lord Eldon's observations in the bankruptcy cases, as applying generally to all trustees and persons in fiduciary situations.

In this country, the exclusion from becoming purchasers, of all trustees having any duty to perform, touching the subject-matter of a sale, though the sale be a judicial one and not under their direct control, may be considered equally well settled.    *Van Epps vs. Van Epps,* 9 *Paige* 237, is the leading American case. There, the complainant having a farm which was subject to a mortgage for $5,000, sold it for $15,000, taking from the purchaser, in part satisfaction of the purchase money, other real estate, and for the residue, a mortgage of the purchaser on the premises sold for $6000. The mortgage was taken in the name of the complainant's son, who was the defendant in the suit, and the land taken in exchange was also conveyed to the son, both the land and the mortgage being held by him upon certain trusts for the complainants. The purchaser had, as part of the consideration for the farm sold to him, assumed the mortgage for $5,000, which was a lien upon it at the time of sale; but

failing to pay it, the mortgage was foreclosed and the farm brought to a sale under it, at which sale the defendant being, as before stated, a trustee for his father under the subsequent mortgage for $6,000, bought the farm.   Here the purchaser was not trustee of the farm which was sold, but only of the $6,000 mortgage which was a subsequent lien for the benefit of his father, the complainant.   But the Court held him to be within the principle of the general rule, which prohibits a trustee to purchase the estate which is the subject of the trust ; and the principle is thus broadly put by the Chancellor, "that no party can "be permitted to purchase an interest in property and "hold it for his own benefit *where he has a duty to perform* "*in relation to such property, which is inconsistent with the* "*character of a purchaser on his own account* and for his "individual use."   Prior to that case, in *Hawley vs. Cramer*, 4 *Cowen* 717-733, the subject had been very fully examined upon all the authorities, and it was there held that the attorney, in an execution, was disqualified to bid at a Sheriff's sale without the consent of his clients, the creditors, or unless their debt should be satisfied.   In that case, he was not allowed to bid as agent for some of the creditors in the execution to the exclusion of others.   Precisely the same point was afterwards determined in Pennsylvania, in *Leisenring vs. Black*, 5 *Watts* 303, and in *Bartholomew vs. Leach*, 7 *Watts* 473, an agent having charge of unseated lands was held disqualified to purchase at a sale for taxes.   So, in Kentucky in *Oldham vs. Jones*, 5 *B. Mon.* 458.   In *Ex parte Wiggins*, 1 *Hill (S. C.) Ch.* (354), one of the assignees of an insolvent, bid at a sale of the insolvent's real estate which had been sold under an order of the Court, made upon a bill filed by the assignees to marshal the assets and settle the estate.   The sale was directed to be made by a commissioner of the Court, under the superintendence of the assignees.   Upon the question whether the sale should be confirmed, it was argued that this, being a sale by order

of the Court and made by a commissioner, was not within the general rule.   But the Court of Appeal, affirming the decision of the Chancellor, held the contrary.   They say, "it is not merely against unfairness in the sale that the "principle is intended to guard.   The cases (referring "mainly to the decisions by Lord Eldon before cited) "suppose, that, in consequence of his connection with "the estate, as trustee, he may have acquired important "information as to its value,—such as the existence of "mines,—which the Court can never be sure he has fully "communicated ; and no one undertaking to act for the "benefit of others shall be permitted to act for his own "advantage in the same matter ;" and the sale was set aside, notwithstanding it had been reported, upon a reference to the Commissioner, to have been *bona fide* and for an adequate price.   The case cited in the argument for the defendants from 6 *W. & S.*, *Fisk vs. Sarber*, does not impugn this principle, although, upon the facts, the decision is not in harmony with it.   That was a sale of an insolvent debtor's estate by the Sheriff, under a mortgage, and the assignee of the insolvent was held by a majority of the Court qualified to bid at the sale.   The Court puts its decision upon the ground that, by the seisure under the execution, the assignee "became divested of his trus-"teeship in regard to it ; that all his power and control "over it ceased, so that he had no duty whatever to per-"form in respect to it, in the slightest degree incompatible "with his buying it at the lowest price for which it may be "obtained."   The Court, by the whole tenor of the decision, conceded that, if any duty remained to be performed or interest to be protected by the assignee, he could not purchase : but they assumed that the duty of the assignee, and his charge of the interests of the insolvent, wholly ceased with his control of the property.   On that point the decision would be very difficult to maintain ; and the opinion of the dissenting Judge (Rogers) seems to me, with all deference. much better sustained authority.

But to come now to the case in hand,—that of a guardianship. Perhaps there is no other trust created by law, except only a trust for a lunatic, which is so comprehensive in its duties, and attended with such utter dependence of the *cestui que trust* upon the integrity of the trustee, and which, therefore, is so important to be guarded against any bias of interest in the trustee. The guardian stands to the ward *in loco parentis*, with duties not less than those of a parent in their scope and sacredness, so far as concerns the property of the ward. And certainly, the charge of the ward's interests in real estate assumed by the guardian on his appointment, must follow the property throughout the process of conversion under the order of the Orphans' Court. Though he is not the trustee of the Court to conduct the sale, he still remains the trustee of his ward to watch over and protect his interests in the whole proceeding.

It is well known that, in point of fact, the guardian exercises a material influence over the proceedings, requiring in him, for the safety of the minor, entire disinterestedness. He is, in these cases the petitioner for the order of sale ; and upon his judgment and information, the Court mainly rely in granting or refusing the order. Ordinarily the guardian is appointed the trustee to sell, and if there be any reason for his not acting in that capacity, still his choice of an attorney practically determines the appointment of the trustee. It can rarely happen that the guardian's knowledge of the property, its condition, advantages and value, will not be necessary, or, at least, beneficial, in fixing the terms and mode of sale ; and his disinterested advice must, in many cases, be useful to the trustee pending the order, and also to the Court on its return. Further, it cannot be without importance that a vigilant oversight of the whole proceeding should be exercised by some one in the direct interest of the minor ; and by whom but the guardian is this duty to be dis-

charged ? Considering both the influential relation of the guardian to the proceeding, and the helplessness of the ward, it is difficult to put a stronger case for the principle that one charged with the protection of the interests of another in a transaction shall take no interest in it himself.

But it was insisted in argument that Rickards was a purchaser before he became the guardian. I cannot so treat him. He was appointed guardian, September 27th 1867. The sale was returned to him October 31st, following. That is the date of his purchase. Before then, he had no real connection with the sale. He was not a bidder, and his understanding with Downs, the bidder, that the property should be returned to him at Downs' bid, brought him under no responsibility to the trustee or to the Court. His appointment as guardian, charged him with the care of the ward's interests, as they might be affected by the subsequent return of the order and confirmation of the sale, and disqualified him from taking, subsequently, any interest under those proceedings. I say nothing as to what would have been the effect of his having been a bidder at the sale before his appointment as guardian.

Again, the confirmation of the sale by the Orphans' Court was relied on as a bar to any equity of the complainants founded upon the disqualification of Rickards, as guardian, to become the purchaser. The argument assumes for the confirmation the effect that the Orphans' Court adjudged him, though the guardian, to be a proper purchaser. To have this effect, it should appear that the Court confirmed the sale with judicial cognizance of the fact that the returned purchaser was guardian, as if that fact had been set forth in the trustees return of the sale. A Court could have judicial cognizance only of facts brought to its notice in the proceeding before it. In this case, Rickards' guardianship was not disclosed to the Court by the trustee's return, or otherwise, by anything that appears of record.

This is the true answer to the argument ; but it may not be amiss to add that it may be taken as quite certain that the attention of the Court was in no way drawn to the fact and, of course, it is not supposable that the Orphans' Court carries in its mind all the appointments of guardians which have been made in it. Let it be observed that a decree of this Court, according to the prayer of the bill, does not impeach or set aside the action of the Orphans' Court in confirming the sale and ordering a conveyance. It leaves the legal title of Rickards under the deed ordered by that Court unaffected, but charges the title thus acquired, with a constructive trust, in equity, arising out of and resting upon considerations which were not brought under the cognizance of the Orphans' Court, and was not the subject of its judicial action. There is, therefore, no conflict of jurisdiction.

Thus far, I have considered this case as if the purchase by Rickards was wholly free from fraud, wishing to recognize, for the future government of this Court, the wholesome rule that no sale to a trustee of the trust property, during the continuance of the trust, however fair in its terms, will be permitted, whether the sale be one made by the trustee himself or a judicial sale made by another person, subject to the exceptions, if such it be, of a fair dealing between the trustee and a *cestui que trust* who is *sui juris*, under such circumstances as amount to a termination of the trust relation between them.

I am not able, however, to acquit the guardian, in the present case, of what the law treats as fraud in this purchase ; and this brings us to the second ground for raising an implied trust for the minors. I do not mean that Mr. Rickards intended to cheat his wards. Doubtless, he considered the guardian bond as a sufficient security ; but he did, in fact, get the land of his wards by means of a gross breach of his duty as their guardian is not paying over the purchase money—a breach of duty greatly imperilling

his wards' interests.   Further, he enabled himself to do
this by practicing a deception upon the Orphans' Court in
his petition for an order on the trustee to pay over the
purchase money to him.   And again, upon a view of all
the circumstances and of the actual results, it is impossi-
ble to resist the conviction that this guardianship was ob-
tained and used as a contrivance for getting the land
without raising and paying over the purchase money.

The purchase money was $3750.00, yet the trustee,
when he made his return, had in hand, as the answer of
Rickards states, only some $400.   Mr. Reed, the Trustee,
in his testimony, says that Rickards had paid him
$1257.82.   The discrepancy may be accounted for by the
fact that $750.00 represented the value of the dower,
which would leave in Mr. Reed's hands about $400.00 on
account of the purchase money of the title of the minors.
The difference is not material to the case.   Certain it is
that, for the bulk of the purchase money, no cash was in
hand at the return of the sale.   The answer of Rickards
states that, instead of the money, he gave the trustee his
"check or bond."   The trustee's testimony is, that
Rickards gave him "notes and bonds of undoubted
"character"—"which," the witness says, "were taken
"by me as good and available at the time."   It is per-
fectly immaterial which is correct.   Then followed the
trustee's return of sale and the confirmation by the Court.
Then the petition of the guardian to the Court, setting
forth, in express terms, as a fact, that there was then "in
"the hands" of the trustee, "the sum of $3617.45 belong-
"ing to the wards of the petitioner" and praying an order
of the Court directing the trustee "to pay over into the
"hands of the petitioner the said sum of $3617.45"   The
Court seeing nothing more in the transaction than ap-
peared on its face, made the order, whereupon the trustee,
after deducting the costs, paid over to Rickards, as guar-
dian, the small balance left of the cash which he had re-

ceived from Rickards, as purchaser, and handed him back the securities, whatever they were. A receipt in the usual form was taken from the guardian, which closed the business. Now, these are facts all on the record, and not at all in controversy. They are not touched by the denials of the answer. They present two features of fraud.

1st. A breach of guardian's duty to his wards. What was his duty ? To raise the purchase money that it might be held and invested as a trust-fund. It is not true that the guardian is a mere debtor to his ward, at liberty to deal with the fund as if it were money borrowed, and so to subject it to all the hazards of business or speculation. He is a trustee, holding a fund not his own, which it is his duty to keep separately invested in his name, as trustee, free from all risks affecting his own affairs. It is quite as strictly a trust fund in his hands, and, as such, to be invested for the minors, as if it were money held for the minors by the Orphans' Court. The guardian's omission to so deal with it is a gross breach of trust. I speak only of the legal character of the omission to invest, not imputing criminal motive ; for it may be that it is not the common impression that the relation of a guardian is so strictly fiduciary as I have put it ; probably there has been some relaxation from the estimate of it held in times past, and it is likely that good and well-meaning men acting as guardians do use the money of their wards, considering themselves as mere debtors rather than trustees. But they mistake their true legal relation. It is true that the guardian, on his appointment, gives bond with surety ; but for what object ? Not for the payment of a debt properly so called ; but, in substance and effect, the bond is a security for the faithful performance of his duties as guardian, one, and a most important one, of which duties is, the safe investment of his ward's money as a trust-fund. It is also true that if, at the termination of the guardianship, the balance due to the ward is, in fact, paid, the

Opinion:—the funds of the ward should be invested by the guardian.

ultimate purpose of the bond is satisfied, and the guardian discharged, whatever he may have done with the money ; but, though a final settlement discharges him from the consequences of having converted the money to his own use, it does not justify him or render the conversion any the less a breach of duty at the time.   Now, how just and important this view of a guardian's relation to his ward, and of his duty respecting the trust fund is, there could be no more forcible demonstration than the history of this case, taking the facts assumed for the defendants.   It is argued, and I have not been obliged to question it, that the bond of Rickards and Lofland was, when given, in September 1867, an adequate security ; and yet, within three years, both confessedly were insolvent, their property sold by the Sheriff, Rickards removed from the guardianship and the estate of these minors lost, except what may be rescued under the decree of this Court.   Doubtless this is an extreme case, but, considering the vicissitudes of business, the general speculative habit, and especially how far the sufficiency of sureties has come to depend upon fluctuating values of property, it must be apparent that, if the estates of wards cease to be treated as trust funds and may legitimately be employed by the guardian in his private business, or for speculations, (and if one be allowed so must be the other,) then the interests of minors left, as they will be, to all the risk now so largely affecting the solvency of many guardians and sureties, will become, in many cases, wholly insecure.   The only really adequate security, such as the law contemplates, is in treating the ward's property as a trust fund and holding the guardian strictly to the responsibilities of a trustee.  I cannot, therefore, accept the theory of the answer, that it was wholly immaterial whether Rickards paid over the money to the trustee so as to create a trust fund for the minors, to be invested for them, either by the Orphans' Court or by their guardian, thus securing them in all events as the law contemplates, or whether he paid

no money and received and invested no money, thus throwing his wards solely upon what is essentially an uncertain and what, in this case, proved to be worthless security, the guardian bond. The Orphans' Court, had the transaction been disclosed to it, would have considered the difference material enough to have either required the money to be raised and paid into Court for investment there, or to have removed the guardian and appointed another. It may well be that a guardian, rightly regarding his duty and his ward's interests, would deem it a needless formality to pay over money as a purchaser, and with the same hand take it back as guardian ; but a guardian, acting only with such a purpose, will be found to have afterwards raised and invested a trust fund for his ward. Supposing that were afterwards done, then it would be true, as the answer insists, that it matters not whether the 'cash be paid to the trustee and returned to the guardian, or receipts be exchanged, that is ; it would not matter, practically, in the result, though still it would be an improper dealing with the Court. So much for the guardian's breach of duty in this transaction to his wards.

The other feature of his conduct to be now noticed, is the deception practiced upon the Orphans' Court in order to make the expedient effectual. The practice of our courts, both the Orphans' Court and the Court of Chancery, contemplates that, in the case of a sale not on credit, the purchase money be paid to the trustee before his return of the sale ; that it be deposited by him in Bank to the credit of the Court. Usually the trustee, in his return, makes a statement to that effect. In this case, the trustee's return states nothing as to payment of the purchase money. Mr. Reed appears, from his testimony, to have been under the impression that a trustee is at liberty to accept from a purchaser anything satisfactory to himself, leaving the Court to the trustee's personal reponsibility for the forthcoming of

the money after the land is gone. This case is a clear mistake. In no case would the Orphans' Court knowingly confirm a trustee's sale until the purchase money shall have been paid and deposited ; and the fact ought always to be so returned by the trustee. Here, then, the Court was misled in a matter material to its action, though, in saying this, I impute no intentional wrong to the trustee. Then, next, the Court was directly deceived by the guardian in representing, by his petition, that the money was in the trustee's hands, and praying an order for its payment over to him, when in point of fact, the trustee held a very small portion of the whole purchase money. But for this statement, the order for payment to the guardian would not have been made.

There is another feature of the case which cannot properly be overlooked. The evidence leaves an irresistible impression that the guardianship of these wards was accepted for the purpose of getting, by means of it, their land without the necessity of raising the purchase money at the return of the sale. The answer denies that the guardianship was sought as a means of acquiring the property without paying for it. Doubtless this is true.

Mr. Rickards, I fully believe, felt himself able and expected, ultimately, to pay for his purchase ; that is, by charging himself as guardian, and settling with his wards at their majority. It may also be true, as the answer alleges, that when he agreed with Downs to be returned as the purchaser, in July, 1867, he did not contemplate becoming the guardian. This expedient may well have been an after-thought. Certain it is,—for Mr. Reed, so testifies—that at the regular term of the Court commencing September 27th, to which the order was returnable, Mr. Rickards could not comply, and hence the return was postponed, It is also certain that Mr. Rickards then, neither surrendering the opportunity to purchase nor being able to comply, became appointed guardian. Now, under

these circumstances, the use that was expected to be made of the guardianship would be fairly inferable from the use that in fact was made of it ; but here the testimony of Martin R. Ford comes in and puts, beyond inference, the preconceived purpose of Mr. Rickards : for Ford says that, in a conversation between them, before the appointment, Rickards asked his, the witness', opinion " about being appointed such guardian and the buying of the Downs " farm," and said that "if he could be appointed guar- " dian of the Downs children, he could buy the Downs " farm, as he would not have to pay the children's money " until they came of age." He also stated, in the same conversation, what there is no reason to doubt, viz : that the mother of the children desired him to be appointed. But the point is not whether he sought the guardianship as a volunteer, but what use he proposed to himself to make of it should he comply with the mother's wish.

What then, upon a general view, is the case presented ? It is this ; Mr. Rickards, while about purchasing the land of the two children of tender years, and being unable to comply with the obligations of a purchaser, takes the guardianship of the children as a means of effecting the purchase without, in fact, raising and paying over the pur- chase money, as was required by the practice of the Court, and his duty as a purchaser. It was an arrangement which would have been most certainly thwarted by the Orphans' Court if disclosed to it, yet the Court, being not only kept in ignorance of the transactions between the trustee and the guardian, but actually misled by the un- true statement of the guardian's petition, is made itself the instrument for giving effect to the expedient ; and thus the guardian, by a gross breach of trust, effected through a fraud on the Court, acquired his wards' land without providing for them the security of a trust-fund such as the law contemplates, but throwing them back upon the guardian bond, which he ought to have known.

was a very precarious security, and which proved to be on utterly worthless one, thus, in the result, stripping his wards of their whole estate, except such as may be secured by a decree of this Court ; and the effort to save even so much of it he is now resisting.  I have no hesitation in dealing with this as a case of legal fraud.  At the same time, I believe that Mr. Rickards did not intend ultimately to defraud the wards, although certainly he was not duly sensitive to the interests of the children and to his duty as their guardian.

Let an interlocutory decree be entered for an account of the rents and profits of the land since Mr. Rickards held it, and of the money paid for it, and expenses incurred by him for its benefit.