Faith VREDENBURGH, Plaintiff,

v.

E. Russell JONES et al., Defendants.

Alexis I. duPont deBIE, Plaintiff,

v.

E. Russell JONES et al., Defendants.

In the Matter of the ESTATE of Alexia duPont Ortiz deBIE, Deceased.

Court of Chancery of Delaware, New Castle.

Submitted April 18, 1975.

Decided Nov. 26, 1975.

**26**

Henry A. Wise, Jr., Wilmington, for plaintiff Faith Vredenburgh.

David Roeberg, Roeberg & Agostini, Wilmington, for plaintifff Alexis I. duPont deBie.

David A. Drexler, Morris, Nichols, Arsht & Tunnell, Wilmington, for exceptants.

Rodman Ward, Jr., and Mason E. Turner, Prickett, Ward, Burt & Sanders, Wilmington, for defendant and third-party plaintiff E. Russell Jones, and others.

Bruce M. Stargatt, Young, Conaway, Stargatt & Taylor and Victor F. Battaglia, Biggs & Battaglia, Wilmington, for defendant and third-party defendant Howard L. Williams.

Andrew G. T. Moore, Killoran & VanBrunt, Wilmington, for defendant Arundel Mining Co., Inc.

BROWN, Vice Chancellor.

This cause, as it came on to be heard, derives from the consolidation of three separate but overlapping actions arising from the administration of the estate of Alexia duPont Ortiz deBie by her executor, E. Russell Jones. The initial action (O.C. No. 1133–A) was initiated many years ago on behalf of Faith Vredenburgh and Alexis deBie, the two children of the decedent. This action is in the form of exceptions taken to the first and subsequent annual accounts of the executor filed with the Register of Wills for New Castle County. Subsequently, through separate counsel, Faith (C.A. No. 4037) and Alexis (C.A. No. 4153) brought suit against Jones, as executor, against the defendant Howard L. Williams, Esquire, as attorney for the estate, against Arundel Mining Co., Inc., and others mentioned with more particularity hereafter. By third party complaint, Jones and other individual defendants seek contribution or indemnity from Williams on account of alleged professional negligence in representing the estate. The separate actions of Faith and Alexis primarily seek recovery against the executor and the defendant Williams for certain specific property interests bequeathed to them by their mother which they surrendered to the executor in return for cash, and which the executor, in turn, sold to himself and others closely affiliated with him. The exceptions action deals with this aspect also, as well as with certain other claims of misconduct for which surcharge is demanded against Jones in his capacity as executor. This is a decision after trial on the various issues presented as I have interpreted them.

The crux of the matter involves the handling by the executor and other named individual defendants of mining interests owned by the decedent at the time of her death in property located near Marysvale, Utah. The detailed facts presented by the evidence are voluminous. The highlights recited hereafter appear to be without dispute and will suffice for the purpose of this decision.

Alexia duPont Ortiz deBie was a woman of strong will and purpose, no matter how unconventional the latter might happen to be. She was also very wealthy, being the beneficiary of trusts created by her mother exceeding $20 million. She also possessed a power of appointment as to such trust funds. At her death she owned a large residential estate in the Wilmington area known as "Valmy" and a tract of valuable farmland known as "Arundel Farm" as well as certain real estate in Nevada.

During the latter 1940's she was persuaded by an itinerant peddler of mining stock to invest in mining operations in

Utah, and as a result took an active interest in mining. By 1953 she became the lessee and thereby the exclusive investor in a mine owned by a company called Deer Trail Mines, Inc. She chose to do business under the name of Arundel Mining Co. and found that under then existing tax laws she could write off most of her mining investment against her substantial income.

The defendant Jones, now some 75 years of age, was a man of humble beginnings and limited formal education who had once worked in the cashier's cage in a local stock brokerage as well as for a large Wilmington munitions corporation. Due to a decline in the munitions industry after World War II he found himself unemployed and with dim prospects for a new start because of his age. In addition, he had worked on a part-time basis for Mr. deBie's mother, keeping books on her farming operations and other matters from 1927 through her death in 1940, and thereafter he stayed on to perform similar tasks and act as business agent for Mrs. deBie, eventually making this his primary occupation. In this capacity he over-saw the management of the mining operation for her, hired employees, negotiated contracts, etc.

The defendant Treseder was the geologist-engineer who actually operated the mine, but who had virtually no direct contact with Mrs. deBie. The defendant Hunt was a certified public accountant with his office in Utah and acted as accountant for the mine as a part of his general practice. Jay Sylvester was the superintendent for the mine. Also one Clyde Randall, since deceased, who was Dean of the School of Business at the University of Utah among his several avocations, acted as attorney and tax consultant for Mrs. deBie, and later her estate, in Utah. The defendant Williams served as Delaware attorney for Mrs. deBie and later her estate.

The first lease executed by Mrs. deBie covering the period from 1954–56 contained a provision which required her to expend a minimum of $50,000 per year in development and operations work. Later, a third lease executed by her in 1959 covering a five-year period through the end of 1963 increased this yearly expenditure requirement to $80,000. It also contained an option which would have permitted her to extend the lease through 1966.

By 1962, Mrs. deBie was suffering from cancer and it was known that her health was not good. In June of 1962, through Jones, she caused Williams to prepare a codicil to her will which she executed with full knowledge of the unusual powers it would give her executor with regard to her mining interests. She had made provision for her children, Faith and Alexis, by a separate exercise of her power of appointment over her mother's trusts. The codicil to a large extent forms a basis for this controversy and, because of its unusual nature, it is set forth at length hereafter:

"(b) At the present time, I have under lease certain mining properties situated in Mt. Baldy and Ohio Mining District, County of Piute, State of Utah. Under the terms of that lease, it is provided that upon my death, the Executor of my estate shall have the option of continuing or terminating the lease. I wish at this time to confirm the fact that my Executor shall have complete and unquestioned discretion as to whether or not operations under the lease shall be continued or terminated. This discretion shall exist not only under the present lease but any extention of that lease or any new lease to which I may hereafter become a party. Furthermore, I specifically authorize my Executor, in his sole discretion, to expend funds from my estate for the purpose of developing or operating the aforementioned mining properties. I further provide that if at the time of my death the lease still stands in my name, then I give, devise and bequeath a twenty percent (20%) interest in the lease unto each of my children and unto E.

28

Russell Jones, and five percent (5%) unto Quillen F. Treseder, of Salt Lake City, Utah. The remaining thirty-five percent (35%) interest shall be held by my Executor for the purposes mentioned hereinafter. In the event my Executor shall determine, in his sole discretion, that the lease should be assigned to a corporation, then upon such assignment the stock of that corporation shall be issued twenty percent (20%) to each of my children and twenty percent (20%) to E. Russell Jones, and five percent (5%) to Quillen F. Treseder. The remaining thirty-five percent (35%) of the stock shall be held by my Executor and he, in his sole discretion, shall have the authority to sell any or all of such thirty-five (35%) for the purpose of raising development or operating capital or raising monies necessary in order to complete the administration of my estate, including, but not limited to, the payment of taxes. Whether unincorporated or incorporated, if my Executor should conclude some or all of the thirty-five percent (35%) interest need not be sold then the portion not sold shall be divided equally between my children.

"As is apparent, I have given my Executor extremely broad discretion as to the making of decisions in connection with the development and operation of Arundel Mine and the sale of stock if the lease is held by a corporation. This is done with the full understanding of the broad powers which I have conferred. It is my intention that in the exercise of those powers, the decisions of my Executor shall not be questioned and he shall incur no liability whatsoever as the result of any decisions he makes. Furthermore, if any question is raised, any expenses incurred by my Executor in defending his actions shall be borne by my estate and if any liability should be assessed against my Executor, he shall be indemnified from my estate."

It must thus be noted that Mrs. deBie bequeathed her interests in the mining lease as follows: 20% to Faith Vredenburgh, her daughter; 20% to Alexis deBie, her son; 20% to E. Russell Jones, her executor and business agent; 5% to Quillen Treseder, her mining engineer; and 35% to her residuary estate. Her will bequeathed some $40,000 to twenty-seven other named legatees, but her residuary legatees were also her two children, Faith and Alexis.

Subsequent to the execution of this codicil, Jones and Williams went to Utah to renegotiate the mining lease even though, with the option, it could have been continued on the same terms for an additional four years. The new lease that was finally executed bore some significant changes. Under the 1959 lease Mrs. deBie had the right to terminate at any time subject only to the payment of three months rent (totaling $4,500) plus any unexpended amounts of the $80,000 obligated development expenditures, prorated to the date of termination. In the event of her death, her executor could terminate on these same terms.

Under the new lease she had no right to terminate during its first two years, and thereafter her right to terminate was subject to a $50,000 penalty. Her executor was likewise bound by the same terms in the event of her death. The annual development expenditure requirements were increased from $80,000 to $100,000 per year and option provisions allowed the lease to be extended up to a total of twenty years. This new lease went into effect on January 1, 1963. Mrs. deBie died on February 11, 1963, some three months after having executed it.

Without question she had taken an active interest in her mine during her lifetime and, over the period from 1953 to 1962, she expended some $1.2 million on exploration and development without producing and selling any ore of any consequence. It does not seem amiss to characterize her mining activities as both a hobby

and a tax shelter. Nonetheless, she always cherished the expectation that some day her mine would become a very profitable item.

Because of the yearly expenditure requirements of the new lease, Jones sought a ruling from the Internal Revenue Service after Mrs. deBie's death that the estate was entitled to a deduction for the $200,000 it was obligated to expend on the mine during the first two years of the lease (less some $15,000 that had been spent in 1963 prior to her death) plus the $50,000 termination penalty. Although no such preliminary ruling was given, Jones did eventually claim this as a deduction for estate tax purposes and it was not challenged. At the time, however, feeling that the estate was obligated to make this expenditure, and having been so advised by Williams and Randall, Jones determined to sink some $235,000 of estate funds into the further operation and development of the mine. And, although the lease obligation would have permitted such expenditures to be used to extract and market the small ore body that was then known to exist, no part of the $235,000 was used for this purpose.

Technically, however, the estate was insolvent at the time this decision was made. Because Mrs. deBie held the power of appointment over the trust created by her mother, the value of the trusts had to be included as part of her taxable estate even though the trust principal was not actually a part of it. Because of this the corporate Trustee of her mother's trust agreed that it was obligated to contribute to the executor for the trust's proportionate share of federal estate taxes. Consequently, in August 1963, Jones obtained an advance on these taxes from the Trustee, of which he used the sum of $235,000 to satisfy what he had concluded to be the fixed development obligations of the estate on the mining lease. It was understood that as executor he would make proper reimbursement so as to pay the taxes as they became due.

Also, because the mining lease was an asset of Mrs. deBie's estate, it was necessary to place a value on it for estate tax purposes. One appraisal was obtained from an independent geologist named Mercer Thompson. His qualifications are not in dispute and he had no connection with the mine. He reported the known ore body as having a value of $53,515.06. Treseder, the mine engineer, valued the known ore body at $58,899.15. Both appraisals were based upon the value of the ore as of February 1963. To arrive at an overall value of the lease it was decided by Randall, Treseder and Hunt to take one-half of Thompson's lower ore appraisal, or $26,717.53, and add to it the value of supplies, cash and equipment on hand, less existing payables. Using this formula, it was determined that the value of the mining lease for estate tax purposes was $62,889.-15.

The plan to spend $235,000 of estate funds was then put into effect by Jones, during the course of which and apparently from the estate funds utilized, Jones, (under the name of Ellis R. Jones rather than E. Russell Jones) paid himself a salary of $325 per month for his duties connected with the mine plus one additional payment of $350 for special mine-related services rendered to the estate. The total amount received by him through these channels was $6,337.50, none of which was reported by him in any accounting filed with the Register of Wills.

By the spring of 1964, Jones, Randall and the others began to consider the incorporation of the mine as authorized by Mrs. deBie's codicil so that corporate stock could be issued to the estate in return for the assets of the mine. Randall undertook to determine the value to be placed on the corporate stock for this purpose. In doing so, he rounded off the estate tax valuation to $62,000 and then discounted it further to the figure of $37,000 which he then advised Jones to be the fair value of the whole mine. Hunt and Treseder apparent-

ly concurred in this computation. Despite the passage of a year from the time of the first evaluation, there was no attempt to revalue assets nor was consideration accorded to the fact that the price of metals had increased. Nor was it considered that the $235,000 being spent by the estate might have enhanced the value of the mine. Nonetheless, the figure of $37,000 was accepted by Jones, and thereafter, to borrow counsel's term, became the *prix fixe* for all corporate related transactions.

It was known to Jones and those working with him that neither of Mrs. deBie's children, Faith nor Alexis, had any interest in or affinity for their mother's mining operation. Alexis was 20 at the time and living in London. Faith had caused her husband to personally inspect the mine site, and was of the opinion that the estate should get out of it. Based on this knowledge Jones wrote to Faith in May 1964, outlining the plans for the corporation and suggesting that if she wished to sell her 20 percent interest he would "make every effort to get the very best appraisal that I can from those in the mining industry who are qualified to give us the very best price." Faith agreed to sell and Jones proceeded to use the appraisal he had already received from Randall. Thus, with estate funds, Jones, as executor, paid Faith $7,400, or 20 per cent of $37,000, for her interest in the mine. Together with the 35 per cent residuary interest left under the codicil, the estate thus became the owner of 55 per cent of the mine.

By August 1964, the $235,000 for development had been used up, and Arundel Mining Company, Inc. was thereupon formed. All assets of the mine were conveyed to it by the estate in return for $37,000 worth of stock. The estate, in turn, distributed 20 per cent of the stock to Jones and 5 per cent to Treseder as legacies under the codicil. Another 20 per cent of the stock was issued in the name of Alexis and held by Jones since Alexis was still a minor. The remaining 55 per cent was held by the estate. Among the assets

conveyed to the corporation were over $10,200 in supplies and prepaid expenses. Later in 1964, Hunt came across certain bills for the estate mining operation which had not been paid, and accordingly the estate was caused to pay the corporation the sum of $13,978.07 to take care of these items. When these factors are considered, it can be argued that the estate transferred the mining lease itself and all equipment and fixtures to the corporation for less than $13,000.

Jones became president and a director of Arundel Mining Company, Inc. Williams, Randall and Treseder were also directors. Once formed, and in order to raise operating capital, the corporation immediately commenced mining operations and within a very short time was mining and selling the known ore deposit. Between August 1964, and December 31, 1964, it sold $133,060 worth of ore at a profit (before depletion and taxes) of some $53,000. By December 31, 1964, it had accumulated $76,000 in cash and receivables. According to Jones, however, based on the information he received from Randall, Hunt and Treseder, this situation was expected to be of limited duration. He personally wrote to the lessor, Deer Trail Mines, Inc., on November 25, 1964, that the Arundel mine would "quite likely" be out of ore by the end of March 1965, unless more deposits were discovered.

Hunt undertook to prepare projections based on an anticipated cessation of operations in March 1965. A formal letter was written from Treseder to Jones on December 16, 1964, with Hunt's projections and a balance sheet attached. Although the current figures reflected that the corporation was making a profit, Treseder's letter referred to such things as precarious mining conditions, possible cave-ins, and high anticipated expenses for timbering, expansion, etc. as realities to be considered for the future. Since communications between these persons had been on a rather informal basis for years, plaintiffs characterize this as the preparation of selling docu-

ments to assist Jones and his friends in eventually acquiring full ownership of the mine at a price substantially lower than its true value.

In December 1964, Alexis turned 21 and Jones caused him to be contacted with regard to the possible sale of his Arundel stock. Earlier Alexis had retained Wilmington attorney William Poole to represent him in connection with the estate. Around January 4, 1965 Poole met with Williams, as attorney for the estate, and learned that Faith had earlier sold her interest in the mine. Williams, acting at Jones's behest, inquired if Alexis would also like to sell. Poole requested information relating to the mine and also expressed some concern as to the legal propriety of an executor purchasing estate property. In response Williams forwarded to him a copy of Mercer Thompson's original ore appraisal of 1963, and Hunt's projection and Treseder's letter of December 16, 1964 (the latter two being described as "selling documents" by plaintiffs).

Some two weeks later Williams again wrote to Poole stating that "we" (apparently meaning Williams and Jones in the context used) had reviewed all data in order to ascertain a "realistic" price for the stock and had concluded that this was the same price paid to Faith several months earlier. The letter went on to ask for an expression of interest on behalf of Alexis to sell his stock at $3.70 per share "if a purchaser can be found." Williams offered no reply to Poole's query as to the propriety of Jones, as executor, purchasing Arundel stock.

Based on the information provided Poole, Alexis agreed to sell his stock. However, his first inclination was to offer it to an acquaintance of his for the $7,400 figure, rather than to a purchaser found by Jones or Williams. Upon learning of this Williams wrote back to Poole pointing out that a sale by Alexis to his friend "would make it extremely difficult for the Executor and myself since the commitment at the

figure mentioned has already been made to other individuals." However, there is no evidence to indicate that any such commitments existed at that time.

Poole subsequently advised Williams that Alexis would sell for the $7,400 figure. Based on this Jones, as executor, proceeded to dispose of all remaining shares of Arundel in the following manner, all at the rate of $3.70 per share based on Randall's $37,000 evaluation. The 3,500 shares representing the 35 per cent interest left to the residuary estate were sold 2,000 shares to Treseder, 700 shares to Hunt, 500 shares to Randall and 300 shares to Sylvester, the mine superintendent. The 2,000 shares that the estate had received from Faith, he sold to himself. Of the 2,000 he purchased from Alexis, Jones caused 400 shares to be transferred to his brother and sisters and 1,100 shares to be transferred to three personal friends of his named Spanagel, Babcock and Mitchell. This left him with 500 of Alexis's former shares. While in Williams's office during the handling of certain of the transactions he advised Williams of this and asked if he too would like to take "a flyer" along with the rest of them. Williams caused his secretary to draw a check for the purchase price and, apparently on the spur of the moment, the remaining 500 shares were sold to him so as to complete the issuance of all Arundel stock.

In the dealings for Alexis's stock it seems clear that all concerned realized that Jones was negotiating to purchase the stock for himself. Technically, however, he used the estate as a conduit for doing so and a check on the estate account was used to pay Alexis for his shares. Also, although Williams had considered that he was buying his shares from Alexis, he nonetheless issued his check to Jones as executor since that was the way in which Jones was handling the transaction. Consequently, it appears that from a purely technical standpoint Alexis's shares were repurchased by the estate and then resold

by Jones to his family members and friends as well as Williams.

By March 1, 1965, all of the foregoing had been accomplished. It seems without question however, that prior to the dissemination of the corporate stock a full 75 per cent of it had come into Jones's hands in his capacity as executor. The remaining 25 ·per cent was distributed to him and Treseder under the terms of Mrs. deBie's will. Consequently, Jones thereafter purchased an additional 20 per cent stock interest from himself as executor and, as executor, sold 40 per cent of the remaining 55 per cent to Treseder, Hunt, Randall, Sylvester and Williams, all of whom, .in one way or another, had a hand in establishing the price for the stock and all of whom who had inside knowledge as to the overall situation and who were also employees of the owner. In other words, estate assets were purchased by the executor and those who stood in a similar position to him and had full knowledge of the situation. The corporation then proceeded with the extraction of the known ore body and within a few months steps were being taken to close out operations due to the exhaustion of the supply. Then, at the last possible instant, but still only a few months after the stock had been sold, a new ore body was discovered in a most unlikely location which had not been theretofore considered. Mining operations were immediately reinstituted, and with such prosperity that by the end of 1965 the corporation with the stock value of only $37,000 in February was able to distribute some $70,000 in dividends to its shareholders. By 1971, when the mine finally had to be shut down because the only available smelter in the area had closed, a total of $200,000 had been distributed in corporate dividends and the corporation itself owned a stock portfolio worth some $250,000. The total benefit received by Faith and Alexis for their original share in this enterprise had been $14,800 and the benefit received by the estate was less than $20,000.

Prior to 1970 neither Faith or Alexis were informed as to the sale of the estate's interest in the mine nor the identity of the purchasers of such interest. Nor was the sale of the mining asset noted on any of the annual accounts filed by the executor with the Register of Wills. At the same time, neither Faith or Alexis made any inquiry as to the status of the estate's interest in the mine even though they had to be aware that· under the terms of the codicil Jones had authority to sell all or any part of the estate's residuary interest in the mine and even though Alexis was aware, and Faith should have been aware as a result of a communication from Mr. Poole, that in early 1965 Jones, as well as Treseder, were likely buyers of stock in the mining corporation. In fact, Faith first became interested in the situation because, also having an interest in the lessor, Deer Trail Mines, Inc., ·she learned from information sent to her by that company in 1970 that it had declared a dividend because of royalties received from Arundel Mining Co. Through her husband and a Washington, D. C. attorney she then began to investigate the situation and ultimately found out who the purchasers of the stock had been. Although the exceptions proceeding had been pending for many years, she eventually employed separate Delaware counsel and instituted her present action against Jones as executor concerning her 20 per cent interest in the mine. Alexis also retained separate counsel and filed a similar suit thereafter.

As a result of these circumstances, the initial question presented obviously involves the propriety of the executor of an estate and those who stand in a similar position to him dealing in assets of the estate.

### I.

 It seems without question that the executor of an estate stands in the position of a fiduciary. *Downs v. Rickards,*

4 Del.Ch. 416 (1872). It is further a fundamental principle of our law that one who stands in such a fiduciary capacity shall not act for himself in any matter with respect to which he has duties to perform or interests to protect for another. Specifically, one who is acting in such a position of trust cannot be a purchaser from the estate for which he is trustee, however fair the terms of sale or however honest the circumstances of an individual transaction may be. *Downs v. Rickards, supra; Eberhardt v. Christiana Window Glass Co.,* 9 Del.Ch. 284, 81 A. 774 (1911); *In re Wheeler's Estate,* 11 Del.Ch. 469, 101 A. 865 (1917); *In re Pennewell,* 12 Del.Ch. 408, 105 A. 377 (1918); *Wilmington Trust Co. v. Carrow,* 14 Del.Ch. 290, 125 A. 350 (1924); *In re Thomas,* Del.Supr., 311 A.2d 112 (1973). This prohibition does not rest upon fraud or improper advantage obtained by a purchasing fiduciary. Rather, as stated in *Eberhardt v. Christiana Window Glass Co., supra,* at 81 A. 778 (quoting *Downs v. Rickards*):

"In view of the difficulty of unraveling fraud in these transactions, the policy of the rule is to exclude the possibility of it by making the prohibition absolute."

When a trustee or other fiduciary does purchase at his own sale, however, the transaction is not void, but voidable. *In re Wheeler's Estate, supra.* Indeed, the mere fact that a fiduciary has purchased from the estate entrusted to him would seem to make the transaction *prima facie* voidable. 3 *Pomeroy's Equity Jurisprudence* § 958(d) (5th Ed. 1941).

At the same time, the fact that such a transaction is voidable only, and not void, indicates that there can be exceptions to even this restrictive rule of law where the circumstances justify it. Compare, *In re Thomas, supra; Equitable Trust Co. v. Gallagher,* 34 Del.Ch. 249, 102 A.2d 538 (1954). As stated by Pomeroy at the above reference:

"There is, however, no imperative rule of equity that a transaction between the parties is necessarily, in every instance, voidable. It is possible for the trustee to overcome the presumption of invalidity. If the trustee can show, by unimpeachable and convincing evidence, that the beneficiary, being *sui juris*, had full information and complete understanding of all the facts concerning the property and the transaction itself, and the person with whom he was dealing, and gave a perfectly free consent, and that the price paid was fair and adequate, and that he made to the beneficiary a perfectly honest and complete disclosure of all the knowledge or information concerning the property possessed by himself, or which he might, with reasonable diligence, have possessed, and that he has obtained no undue or inequitable advantage, and especially if it appears that the beneficiary acted in the transaction upon the independent information and advice of some intelligent third person, competent to give such advice, then the transaction will be sustained by a court of equity."

In a more concise statement, Justice Tunnell, in *Equitable Trust Co. v. Gallagher,* would require the beneficiary to be *sui juris* and that the fiduciary "in his dealings is candid to the high degree required in such confidential relationships, and further provided that the transaction is in fact fair and reasonable." 102 A.2d 545.

In addition, it was long ago recognized in both *In re Wheeler's Estate, supra,* and *In re Pennewell, supra,* that acquiescence or other conduct on the part of a beneficiary may bar his right to set aside such an otherwise voidable transaction.

Since Jones, as executor, purchased Faith's interest in the mine for the estate and then purchased it from the estate for himself, and since he purchased Alexis's interest in the corporation formed by and controlled by the estate and in turn passed it on to his family and friends, it seems obvious that he has violated the restriction placed on all such fiduciaries and that his

acquisitions are presumptively voidable. Thus, as to Faith and Alexis, issue is joined on the questions, first, whether he can justify his actions under the exception to the general rule and, second, whether Faith and Alexis are now barred by laches fom . attacking the transaction which at the time they were more than willing to enter into.

Jones takes the position that he does qualify for status under the exception. He points out that as far as he knew both Faith and Alexis were represented at the time by Mr. Poole, unquestionably a competent and knowledgeable attorney. Although he chose not to appear at trial, Alexis admitted by deposition that he was aware that Jones (and possibly Treseder) were the likely purchasers of his stock, and, although Faith claims that she had no knowledge prior to 1970 that Jones had purchased stock from the estate, it appears that Poole mentioned this in a letter sent to her as early as 1965. Mr. Poole was apparently aware of something in this regard since he questioned the propriety of the executor dealing in estate property in his letter to Williams in January 1965. Both beneficiaries were advised as to the price set for their percentage of interest in the mining lease, and, according to Jones, it was based on the most recent information then available. Both beneficiaries were solicited for comment or objections if they were unsatisfied with the information offered by Jones, and they made none. Without question, they willingly surrendered their interests to the estate for the price offered. Since he thereafter sold these interests to himself and others for the same price, Jones contends that he acted only upon the informed consent of Faith and Alexis.

■ As indicated by the previous authorities, however, in order for the fiduciary to prevail in such a situation, the evidence must convincingly demonstrate that the beneficiary had full information of all the facts concerning the property and transaction, and that the fiduciary made an honest and complete disclosure of all knowledge concerning the property which he possessed at the time or which he might have obtained with reasonable diligence. The conduct of Jones and those working with him does not pass this test as I see it.

As noted earlier, Faith's interest was acquired before incorporation at a time when the value of the mining interests, for estate tax purposes (and it can be assumed that this was established at a figure as low as possible consistent with honesty), was some $62,000. Her price, however, was based on Randall's calculation as to the worth of the asset for future corporate exploitation. In making this calculation, he sought no new appraisals nor did he give any consideration to the fact that the price of metals had increased from their date-of-death value. Also, no weight was given to the $235,000 that the estate was putting into the mine in the interim. In short, he simply made an arbitrary reduction to $37,000, primarily because of the costs, hazards and uncertainties that would lie ahead for the corporate enterprise. The lack of consideration of the aforesaid factors also applies to the purchase of Alexis's stock several months later.

Further, under the terms of the lease, the $235,000 could have been used to mine the known ore (which defendants say was all they had reason to believe existed) which, had it been done, might well have enhanced the then value of the children's interests. And while it is true that under the terms of the codicil Jones was not required to do this, certain other factors enter in.

For one, Hunt made a projection in November 1964, (when corporate mining operations were in progress), based on the limited extent of the known ore from which it could be concluded that if all ore was mined by March 1965, as anticipated, and the company liquidated, the value of a share of stock at liquidation would have been over $6.00. This projection was not

provided to Poole during the negotiations which convinced him and Alexis to sell for $3.70 per share, or the same figure that had been paid Faith. What was provided were the December projections which included the reports showing the hazardous nature, and thus the risky value, of the enterprise.

In addition, although Williams's correspondence to Poole insinuated that he and Jones would be willing to purchase Alexis's stock if a buyer could be found for it, their stated position immediately changed when they learned that Alexis might sell to a friend. At that point Williams wrote that this would cause embarrassment to him and Jones since commitments for Alexis's stock had been made to others. The inconsistency is completed by a lack of any evidence showing that any commitment had been made at that time to any of the persons who eventually ended up with Alexis's stock. In fact, the reason that Williams ended up taking the final 500 shares was because Jones had no one else who wanted it.

Finally, although I have no doubt that the professional training and experience of Randall, Hunt and Treseder would qualify them collectively to place a value on the worth of the Arundel mine with which they had been associated for years, the fact remains that all of them, along with Jones, ended up purchasing and acquiring 80 per cent of the stock of the corporation for a price which they, in one form or another, either established or went along with, without seeking any independent, updated evaluation from anyone else and without making any adjustment whatever in the components used to earlier establish a date of death value for estate tax purposes.

The foregoing cannot possibly constitute a full disclosure of all knowledge possessed by Jones and his assistants or which could have been obtained through reasonable diligence. Nor would it appear to satisfy the high degree of candor required by fiduciaries in such a situation.

It should be noted that the foregoing elements constitute events reasonably contemporaneous with the acquisition by Jones and his associates of the specific interests in the mine bequeathed to Faith and Alexis. While I cannot find evidence to justify a conspiracy on the part of the defendants to acquire the mine for themselves (as charged by counsel for Faith) certain other obvious factors cannot go unnoticed.

(a) When the lease was renegotiated by Jones, it was after Mrs. deBie, with his knowledge and assistance, had executed the codicil giving him broad powers over her mining lease after her death. It was also at a time when she was in deteriorating health.

(b) When the new lease was executed, the existing lease had over four years to go, with the option, and there was no known amount of ore of significant quantity. Despite this, the new lease was made to cover the next twenty years.

(c) Whereas the existing lease could have been terminated by her executor on three months notice, without penalty, the new lease provided that it could not be terminated by either her or her executor for two years, and thereafter termination would result in a $50,000 penalty. In addition she, or her executor, was required to expend an additional $20,000 per year on development. (This would seem a strange commitment for a woman with cancer to make three months before her death—unless, of course, it was her sincere desire to lock her executor in so as to require one final effort at a major strike for the benefit of her estate after death.)

(d) Of the utmost significance, the information Jones gave to Poole, as well as to the lessor of the mine, based on the reports and projections of Treseder, Hunt, and presumably Randall, indicated that all known ore would be mined by the end of March 1965, and that in all probability the corporation would have to be liquidated. Yet it was in early March 1965, that the

very sources for this information purchased the stock of the corporation held by the estate. In addition, it was at this same time, less than thirty days before the supposed exhaustion of all known resources that Jones sold portions of Alexis's stock to his three personal friends, his brother and his two sisters—one of whom was retired on a limited pension income.

(e) At no time thereafter did Jones reflect the sale of the estate's interest in the corporation on any annual account filed with the Register of Wills.

(f) At no time thereafter did Jones, Williams or any of the defendants advise Faith or Alexis as to the fact that those persons who had been handling the mine for the estate were the persons who had ended up owning it. In fact, when Faith finally made inquiry in 1970 as to the identity of the purchasers, Williams declined to tell her on the theory that she no longer had any interests in the mine.

Thus, viewed overall as well as at the time of the acquisition of the estate property by the defendants, it seems that Jones in acquiring the interests of his beneficiaries for the estate so as to be free to sell them to others under the terms of the codicil, failed in the duty he owed to them as executor.

At the same time, I feel that the complaints of Faith and Alexis, insofar as they seek a return of that specific 20 per cent bequests in the mine together with all profits thereon since 1965, come too late. On this point I agree in particular with the laches argument set forth by counsel for the defendant Williams.

■ But for the fact that Jones was the named trustee (executor) of an express trust (the will), the claims of beneficiaries of the estate that he violated his fiduciary duty in dealing with the Arundel stock would be barred by the statute of limitations. *Bovay v. H. M. Byllesby & Co.*, 27 Del.Ch. 33, 29 A.2d 801 (1943); see also

*Halpern v. Barran*, Del.Ch., 313 A.2d 139 (1973). And, while not absolutely controlling in equity, the statutory limitations period is given considerable weight in passing on the defense of laches in this Court. *Garber v. Whittaker*, 23 Del.Ch. 45, 2 A.2d 85 (1938); *Bay Newfoundland Co. v. Wilson & Co.*, 24 Del.Ch. 30, 4 A.2d 668 (1939); *Restatement of Trusts* § 219. To prevent the statute of limitations from being adopted as a bar, special circumstances mitigating against its application should exist. I see no such circumstances here.

The evidence indicates that Faith and Alexis failed to share their mother's enthusiasm for her mine, and due in large part to this Jones was given the broad and insulating authority by the codicil to continue it after her death. Subsequent to Mrs. deBie's death, Faith, and later Alexis, expressed their feelings that the estate should get out of the mining lease. Clearly, they wanted no part of it and considered it a waste. They had knowledge, either actual or attributable, that the executor was considering the private purchase of additional interest in the mine in early 1965. They were represented by capable counsel. Yet from 1965 through late 1971 they made no effort to inquire about the status of the mine, its success or failure, or its ownership. It was not until six years later, when Faith got the inkling that the former "hole in the ground" might be prospering, that either of them developed any interest in what the executor might have done with their former interests after he acquired them for the estate at a price to which they had agreed. And this despite the fact that the will gave him the authority to sell the estate's stock at his discretion which, in effect, they had expressed a desire that he do.

■ It is argued that the executor concealed the sale of the stock by not listing it on any annual account. But, while this may not have been proper, it cannot be of assistance to those who were content to

make no effort to seek the true facts anyway. Since they were not looking for anything, the failure of Jones to note the sale on his annual accounts obviously put no obstacle in their path to prevent them from becoming aware of it. Compare *Halpern v. Barran, supra.* Moreover, a disclosure on an annual accounting that the stock had been sold by the estate would not necessarily—or, I presume, normally—indicate the identity of those who purchased it.

Under the circumstances, I feel Faith and Alexis are barred by their acquiescence and disinterest for a period of some six years from now challenging the fairness of the acquisition of their mine interests by Jones for the benefit of the estate. This, however, does not end the matter.

## II.

Turning to the codicil, it is true that Mrs. deBie intended to give Jones as much leeway and protection as possible in dealing with the mining lease after her death. A thorough reading of the codicil reveals that she reposed in him "complete and unquestioned discretion as to whether or not operations under the lease shall be continued or terminated." She further authorized her executor "in his sole discretion, to expend funds from my estate for the purpose of developing or operating the aforementioned mining properties." He was further given complete discretion and authority to sell all or any part of the remaining mining interest left in her estate "for the purpose of raising development or operating capital or raising monies necessary in order to complete the administration of my estate, including, but not limited to, the payment of taxes."

 She specifically acknowledged that she was giving him broad discretion as to all decisions in connection with (1) "the development and operation of Arundel Mine" and (2) "the sale of stock if the lease is held by a corporation." She also directed that her executor should incur no

liability as the result of any such decisions, and that if his decisions in this regard were questioned, all expenses incurred by Jones in defending his actions should be borne by her estate and any liability assessed against him indemnified from her estate. However, if the foregoing is carefully analyzed, it will be seen that she was giving Jones broad authority and discretion in the event that he chose to continue to operate the mine as executor after death so as to protect him against claims that he was improperly using estate assets in the continuation of the mine, or that he had needlessly disposed of the residuary interest in the mine to the detriment of the residuary beneficiaries, or that he had negligently sold stock in the mine owned by the estate on improper terms or for an inadequate price. At least this is the way I interpret it. It does not appear to be the intent of the codicil to excuse Jones, as executor, from the established fiduciary duties and responsibilities that would otherwise apply to one acting in his capacity. And of course one of these standards is that an executor shall not deal in estate property for his own benefit.

Thus, while I have concluded that Faith and Alexis are barred by their conduct and acquiescence from recovering in their own right the specific 20 per cent interest in the mine left to each of them, together with all profits derived therefrom, it does not necessarily follow that the executor is free from liability for self-dealing when it is considered that Faith and Alexis were also the residuary beneficiaries of any estate interest in the mine that might remain, and when it is considered that there were other specific legatees of Mrs. deBie who have yet to realize their bequests. It must be noted that Faith and Alexis were never asked to sell or release any residuary interest they might have had in the mine.

As noted before, prior to the sale and transfer of the corporate stock by Jones, the estate had become the owner of 75 per cent of it (excluding the specific 20 per

cent and 5 per cent bequests to him and Treseder). And while the codicil may well have protected him had he improvidently sold the stock on the open market prior to the discovery of the new ore body, or if he had negligently sold it for less than its true worth, I think this intended protection vanished as of the time he sold it to himself, the estate's attorney, and the others who stood in a position similar to him with regard to Mrs. deBie and her estate.

◼ The reasons why I feel that Jones does not fall within the exception that would permit a fiduciary to purchase from himself are set forth previously. That being true, I am of the opinion that the 20 per cent stock interest of the estate in the mining corporation that he purchased from himself as executor must be returned to the estate, together with all dividends received by him on that stock.

◼ As to the defendant Williams, as attorney for the estate, the aforementioned facts and fiduciary responsibilities are no less applicable to him in that capacity. *Downs v. Rickards, supra,* and thus the 5 per cent stock interest purchased by him must be returned, together with all dividends paid thereon. I have no doubt that because of the circumstances existing at the time Williams considered that as a practical matter he was purchasing the shares from Alexis, not the estate. However, I fail to see how I can ignore the fact that Jones first acquired these 500 shares from Alexis by the use of estate funds and that Williams actually tendered his purchase price to Jones as executor. In a situation such as this, where the conduct of an attorney exercising fiduciary responsibility is concerned, I think that the transaction must be judged in the manner in which it was handled rather than what might have been intended. Compare *Opdyke v. Kent Liquor Mart, Inc.,* 40 Del.Ch. 316, 181 A.2d 579 (1962).

As to the balance of the stock sold by Jones to Hunt, Treseder, Randall, Sylves-ter and the family members and friends of Jones, a different problem obtains. Counsel for the exceptants argues that from the evidence it is clear that Jones, in simply accepting Randall's recommended valuation of the stock as its selling price, failed to use the prudence and discretion required of a trustee. *Lockwood v. OFB Corp.,* Del. Ch., 305 A.2d 636 (1973). He further suggests that the selling price of $3.70 per share was woefully inadequate based on the information known to Jones, Hunt, Randall and Treseder at the time the stock was sold. He asks that as executor Jones be surcharged for all dividends on such stock as well as for its current value less the sale price actually received. However, I am inclined to approach from a different angle.

As noted previously, Treseder, Hunt and Randall, along with Jones, were the parties actually involved in operating the mine both before and after the death of Mrs. deBie. They were in the best position to know its worth or potential and, for that reason, in one degree or another, they all participated in establsihing the price which they paid Jones for the stock. It is true that they were not fiduciaries to the estate in the sense that Jones and Wiliams were. Nonetheless, they were hardly disinterested third parties. In view of the relationship between them, I think that the situation is one which should be governed by the rationale set forth by the Pennsylvania Supreme Court in the case of *In re Noonan's Estate,* 361 Pa. 26, 63 A.2d 80 (1949).

That case involved an attorney who, acting as executor for an estate, sold real property of the estate to his private secretary with full knowledge that the sole beneficiary desired to keep the real property and was willing to pay the debts of the estate in order to do so if it was within his means. In order to enable his secretary to make the acquisition, the attorney loaned her a portion of the purchase price and took a mortgage back on the property. He also sold her the household furnishings as

to which the secretary had acted as an appraiser for estate purposes. In its opinion the court stated as follows at 63 A.2d 83:

"The executor was, moreover, guilty of self-dealing, as the circumstances attending the sale disclose. Such a transgression does not lie exclusively in a fiduciary's sale of trust property to *himself*. Cf. *Downing Estate,* 162 Pa.Super. 354, 57 A.2d 710, affirmed per curiam by this court: 359 Pa. 534 [535], 59 A.2d 903. The test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in material connection. *Downing Estate, supra,* 162 Pa. Super. at page 359, 57 A.2d 710, citing Scott on Trusts, Vol. 2, § 170.12, p. 877, and Restatement, Trusts, § 170(1), Comment h. See also Comment c of the same section . . . ."

And further at 63 A.2d 84:

". . . the agreement of sale embraced not only the realty in controversy but the decedent's household goods and personal chattels (save a few excepted articles) at their appraised values as fixed by the appraisers, one of whom was [the secretary]—hardly less than indirect self-dealing, when considered in the light of the executor's favoritism for the purchaser whose self-aggrandizing capacity was of the executor's own deliberate choosing."

The court went on to hold that for a third person to retain property sold by an executor in breach of his trust, the purchaser must have acquired it for value without knowledge of the attendant circumstances constituting the executor's breach. In quoting from the *Restatement of Restitution,* § 201(1) the court concluded as follows at 63 A.2d 85:

"Where a fiduciary in violation of his duty to the beneficiary transfers property or causes property to be transferred to a third person, the third person,

* * * *If he had notice of the violation of duty,* holds the property upon a constructive trust for the beneficiary."

Based on this reasoning, the executor's private secretary was directed to reconvey both the real property and the personal chattels.

While the language of the codicil here gave Jones great flexibility in dealing with the mine, his position as executor still required that he use his best judgment for the overall benefit of the estate and its designated beneficiaries. Although I interpret the codicil as providing him with exoneration for mistake or inadvertence in selling the stock of the mining corporation, if he formed one, it did not entitle him to ignore completely the standard imposed upon a trustee in disposing of property belonging to his trust. As stated in *Lockwood v. OFB Corp., supra,* at 305 A.2d 638:

". . . in . . . selling . . . property for the benefit of another, fiduciaries shall exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs . . . .

* * * * * *

"In short, he must do those things which men of 'prudence, discretion, and intelligence' would do under the circumstances to assure that the sale brings the best price obtainable."

 I think it obvious that a sale by an executor to his business associates of many years at a price which they mutually placed on the estate property based on circumstances existing a year before, without consideration for any change of events taking place thereafter and without seeking any independent appraisal or soliciting offers from others, constitutes a gross violation of this standard. Furthermore, under the particular circumstances of this case, I think it equally obvious that Hunt, Trese-

der and Randall are chargeable with knowledge that Jones was in breach of his duty as an executor when, collectively, they decided among themselves to sell and purchase the stock from the estate for a price they had placed upon it a year before. Furthermore, Jones, as director, shareholder and salaried president of the corporation obviously had a personal interest in seeing the overall controlling interest in the corporation reposed in him and his compatriots of many years who had actively worked with him in an effort to ultimately make the mine a thing of value. As in *In re Noonan's Estate*, I think that the stock purchased by Hunt, Treseder and Randall should be returned to the estate, together with all dividends received by them thereon. Insofar as this may be impossible to accomplish at this late date, Jones, as executor, must be surcharged for the difference.

■ At the same time, this rationale does not apply to the sale of the 1,500 shares to Jones's sisters, brother and three personal friends. From the evidence I can find no knowledge of the situation attributable to them which would deprive them of the status of bona fide purchasers without notice. They were each approached by Jones and agreed to purchase the stock on his recommendation. I am convinced that at the time they were all innocent of the developments that had placed him in a position to offer the stock to them at the quoted price. Thus, I conclude that they acquired it free of any constructive trust and may therefore keep it, together with the benefits derived therefrom. To the extent that it may be established that Jones sold it at an inadequate price due to his failure to make any impartial effort to first ascertain its then highest value, Jones is subject to surcharge for the difference.

Due to the dearth of any evidence on the subject, this same result holds true for the 300 shares sold to Sylvester, the mine superintendent.

### III.

■ I turn now to the status of the defendant Williams. For the reasons I have previously outlined as barring the right of Faith and Alexis to recover against Jones for the specific 20 per cent interest left to them by the codicil, I also conclude that they are barred from any recovery against Williams. Therefore, I find it unnecessary to consider the facts of that aspect of the litigation as they might pertain to the participation of Williams in the actual acquisition of their respective interests by Jones. I do note, however, that from the evidence it appears that the purchase price had been established and arrangements made by Jones to acquire Faith's interest prior to the time Williams was informed of it. I also note that in negotiating with Poole for the acquisition of Alexis's interest, Williams relied on the financial information and protections provided him by Jones as well as the fact that Alexis was being offered the same price previously paid to Faith. His letters to Poole concerning, first, the need to locate a purchaser, and then the commitment allegedly made to others, were also premised on information furnished him by Jones. I find no evidence of any connivance with Jones to obtain their interests at less than a fair price, as charged by Faith. His use of the pronoun "we" in his correspondence to Poole was obviously editorial.

There remains the cross-claim by Jones against Williams for indemnification for any liability decreed against Jones. The basis for this claim is that in acting to acquire estate property for himself and in selling it to his friends and associates, Jones relied on the advice of Williams, and that consequently any liability to Jones for his actions as executor must be charged to Williams.

In this regard it is conceded by Williams that he advised Jones that while he considered it to be risky for him to purchase from himself as executor, he further con-

sidered that if he did so his position would be defensible if subsequently attacked. This advice must be considered in light of two things. First, he was not advising Jones that it was all right to enter into a transaction that was void, but rather one that was voidable only, provided that the candor, fairness and necessity of independent advice due the beneficiaries had not been fulfilled. Secondly, in so doing, he relied on the information transmitted to him by Jones, Hunt and Randall, plus the fact that Faith and Alexis had received independent advice from Poole before agreeing to sell their specific legatee interests at the price offered. In addition, I think it clear from the evidence that Williams was acting as Delaware counsel for Mrs. deBie, and later her estate, and as such took no active part in the operation of the mine. He had no competence in valuing mining stock, and simply accepted the valuations of Hunt, Randall and Treseder. In fact, in October 1964, after Arundel Mining Co., Inc. was formed, Williams wrote to Randall to inquire if there should be an adjustment in the value of the mining interests for corporate purposes. He was advised through Jones that Randall felt that no adjustment was necessary. He did not participate in setting the price, either at the time when Jones acquired the interests of Faith and Alexis or at the time he sold the estate's interest to himself and the others.

From the evidence I find that throughout the entire chain of events, namely, the codicil, the renegotiation of the existing lease, the acquisition of the interests in the mine left to Mrs. deBie's children, the formation of the corporation and the disposal of the corporate stock held by the estate, none were instigated by Williams. Rather they were precipitated either by Jones, his associates, or the decedent herself. Thus, to put things in the proper perspective, if Williams has any liability to Jones, it must be premised on the fact that he did not advise Jones to refrain from the questioned transactions. This, of course, would re-

quire that Williams first had knowledge of all facts involved in time to render such advise. That he did not enjoy full knowledge at all times is, I think, evident, as indicated by the fact that Jones directly requested an advance on the taxes from the Trustee in order to expend $235,000 on the mine and initiated the acquisition of Faith's mine interests without first informing Williams.

In *Pusey v. Reed*, Del.Super., 258 A.2d 460, 461 (1969), it was held that

"In order to recover for an attorney's malpractice, the client must prove the employment of the attorney and the attorney's neglect of a reasonable duty, as well as the fact that such negligence resulted in and was the proximate cause of loss to the client."

 Given Williams's limited personal knowledge of the status of the mine, his awareness of Jones's long standing relationship of trust with the decedent and his reputation of integrity in that capacity, his justifiable belief that Faith and Alexis knew Jones to be a potential buyer of the Arundel stock owned by the estate, his reliance on the $3.70 per share price submitted by Jones and Randall as being fair and reasonable at the time, the failure of either Faith or Alexis to object to the price at a time when they had independent representation, and the broad language of the codicil, I cannot conclude that the advice, or lack of it, given by Williams constituted the proximate cause of liability incurred by Jones as executor, even if he did act in reliance on it.

 While an attorney has an obligation to give his client the best possible advice based upon the situation as he views it and the information supplied or made available by the client, he should not be made the insurer of his client if, through no fault of his own, he is unaware of all information possessed by his client and those working in conjunction with him.

It is also suggested that Williams had a duty to first seek court approval before giving sanction to obvious self-dealing by Jones. However, while this might well provide the safest course, the fact that *Equitable Trust Co. v. Gallagher, supra,* recognizes a permissible exception to the rule against self-dealing by a fiduciary and makes no mention of prior court approval as one of the conditions, would appear to negate the duty argument.

I conclude that Williams has no liability to Jones or the other third party plaintiffs on the claim for contribution or indemnification.

## IV.

Finally, I turn to the prayers of the exceptants to have the executor surcharged for alleged mishandling of estate matters which, it is contended, have improperly depleted the estate. These remaining items are ten in number, and, because of the length of the previous portions of this decision, I will treat them in summary fashion.

(1) The exceptants demand that the executor be surcharged $50,000 for the sum spent in development of the mine so as to give the estate a tax deduction for the advance payment of the $50,000 penalty the estate would incur for terminating the last mining lease prior to its expiration date. This was the amount, added to the $185,000 remaining to be spent under the obligations of the lease during its first two years, which made up the $235,000 spent by the executor for this purpose. The executor defends for the reason that the expenditure of the entire $235,000 was not challenged by the authorities as a proper deduction for estate tax purposes. He also points out that the codicil gave him discretion to expend estate funds for the purpose of development, and that he· did decide to expend the additional $50,000 only after being advised by Williams and Randall, that it would be a proper item for deduction.

Despite the apparent accuracy of this initial tax advice, however, I conclude that the executor must be surcharged for this amount. The simple truth is that the lease was never terminated by the estate and, as I view the evidence, it was never intended to be. Nor was it ever terminated by the corporation. When the corporation was formed, it assumed the lease and went on to successful mining operations. And I think it obvious that Jones, Randall and the others had full intention to form the corporation and continue the lease once the time came to get the estate out of it. Thus, the extra $50,000 expended over and above the $100,000 per year requirement during the first two years after Mrs. deBie's death, done under the guise that the estate would have to pay this amount later as a penalty, actually went to the benefit of the corporation since the penalty never became operative.

Stated another way, had Jones held back the $50,000 to see if it would have been needed to pay the penalty, it would have become apparent when the corporation was formed and commenced successful mining operations that there would be no penalty due from the estate and thus the sum could have been preserved for estate purposes. As it worked out, it was spent for the ultimate benefit of the corporation when it need not have been spent at all.

(2) The exceptants demand that the executor be surcharged $35,000 for a preferential legacy paid to himself. In her will Mrs. deBie provided as follows:

> "I direct that E. Russell Jones be paid the sum of Thirty-five Thousand Dollars ($35,000) as compensation for his performance of the duties as my Executor, in addition to any and all sums which are authorized by the Register of Wills on an estate of this size."

The executor contends that this language creates an additional commission, not a bequest. He paid himself this amount and listed it as a commission on the first ac-

count filed by him. However, the Register of Wills took a contrary view and accordingly the item was changed on the account to reflect a bequest of $35,000 to Jones. Nonetheless he has retained this sum even though the estate was insolvent, the Delaware taxes remained unpaid, and no funds were available to pay the other $40,000 in specific bequests made by Mrs. deBie. Having thus acquiesced on his accounts that the so-called extra commission was in reality a bequest, it appears that Jones has taken his bequest in full while the other legatees have received nothing at all. At the very least 12 Del.C. § 2317 mandates that legacies shall abate proportionately where there is an insufficient surplus after the payment of debts to satisfy them in full. Consequently, I am of the opinion that this sum must be returned to the estate at this time and thus Jones must be surcharged therefor.

(3) The exceptants contend that because of the advance taken by Jones on funds earmarked for the payment of taxes and his subsequent delinquency in paying the Delaware estate taxes, he improperly incurred $46,610.73 in interest which the estate was compelled to pay on the amount of tax due. They ask that he be surcharged in this amount. They point out that during the period that the total Delaware taxes of $280,192 remained unpaid, Jones, as executor, paid himself his $35,000 bequest, took down some $209,000 in commissions and spent over $200,000 in speculative development of the mine. In defense, the executor argues in general terms that at all times that the taxes were delinquent he was receiving from estate investments a higher rate of return than the amount of interest accumulating on the delinquency. Since he would have had to liquidate the investments in order to pay the taxes, Jones argues that his nonpayment of the taxes actually benefited the estate, and thus he should not be held personally accountable for the interest on the unpaid estate taxes.

Whatever practical appeal this defense may have, an examination of the applicable statutes indicates to my mind that it is no defense at all. 30 Del.C. § 1504 provides that the Delaware estate tax is due within 15 months from the date of death (unless, presumably, an extension is given by the taxing authorities). 30 Del.C. § 1505(a) directs that an executor shall pay the full amount when due, out of moneys belonging to the estate in his hands which, when paid, shall be for the use of the State. 30 Del.C. § 1505(c) states

"Every executor . . . is personally liable for the payment of such tax, and the faithful performance of his duties under this section shall come within the condition of his official bond. Any failure of the executor . . . to perform his duties under this section shall forfeit his right to all commissions for settling the estate of his decedent."

The import of the foregoing clearly indicates a legislative intent that an executor shall not speculate with tax monies due the State even if his efforts are earning the estate a return greater than the penalty accruing in favor of the State. It also mandates that part of the executor's responsibility is to pay the taxes when due if the estate has the funds available, and makes him personally liable for the consequences if he does not. How, then, can it be a defense to say that the violation of a statutory duty is permissible so long as the violation turns out successful in earning the estate more income than is needed to pay the penalty for the violation?

I think the policy expressed by the statutes is that the taxes due on an estate are to be paid promptly, particularly when the funds are readily available, and that failure to do so renders the executor personally liable for the consequences. By his own admission here, Jones could have paid the estate taxes when due, but chose not to do so. As a consequence the estate was assessed $46,610.73 in interest on the delin-

quency. The policy of the statutes requires that he be surcharged in this amount even if his improvident gamble with funds earmarked for taxes did result in an overall benefit to the estate. See also 12 Del.C. § 2304 and 12 Del.C. § 2902.

▪ (4) The exceptants demand that the executor be surcharged $59,500 for the total salary and benefits paid to him as an officer and director of Arundel Mining Co., Inc. from January 1, 1965 through March 20, 1974. Their theory is that an executor cannot profit from wrongful conduct in breach of his fiduciary obligations. They do not elaborate on this, however, and consequently I see no basis for requiring from him the return of the relatively modest remuneration received by him over a period of nine years for services performed on behalf of the corporation in a different capacity than that of executor. There is no thought that if he formed a corporation he was to run it in his capacity as executor and be compensated solely through his commissions on the estate. Nor is it contended that he failed to earn his pay while serving as president and director. This claim for surcharge is denied. It seems more in the nature of a request to impose a penalty.

▪ (5) The exceptants demand that Jones be surcharged $7,434.58 for salary and payments taken from the estate for services performed on behalf of the mine operation between the date of Mrs. deBie's death and the date of incorporation. He did not account for the payment of these sums to himself on the annual accounts filed with the Register of Wills. Exceptants contend that such payments were in reality secret commissions and must be returned. However, it appears that at the time of Mrs. deBie's death she was paying Jones a salary for overseeing the mining operation, and, after her death, he merely continued it on in the same amount while performing the same duties in addition to his new duties as executor. This claim for surcharge is also denied.

▪ (6) The exceptants demand that the executor be surcharged $1,220 for legal fees paid to Clyde Randall, which payment was not listed on the annual accounts. The theory is that legal fees are taken into consideration by the Register of Wills in determining the amount of commissions to be approved for the executor, and that by not reporting this sum, Jones was able to realize a like amount for himself in commissions he otherwise could not have justified. The legal fees seem reasonable and, from the evidence, I am not prepared to say that simply because Jones neglected to make timely report of them he must now make full repayment to the estate. This claim for surcharge is also denied.

▪ (7) Mrs. deBie, in another portion of her will, devised to Elizabeth Vredenburgh Knight a ranch located in Nevada in addition to a bequest of certain personalty. According to the Sixth Accounting the ranch and personalty were delivered to Ms. Knight. 12 Del.C. § 2901 provides that whenever a personal representative is required to pay Delaware estate tax pursuant to 30 Del.C. Ch. 15, "the amount of the tax so paid shall be equitably prorated among the persons interested in the estate to whom such property is or may be transferred . . . ." The exceptants point out that Jones delivered this property to Ms. Knight without making any provision to obtain from her the prorated portion of the estate tax attributable to the value of the property she received. They ask that he be surcharged for this in whatever amount her share of the tax may ultimately be determined to be. However, Article XIII of Mrs. deBie's will states that all legacies and other beneficial interests created by it "shall be free and clear of my estate, inheritance, succession or other taxes which, if chargeable, shall be paid out of the principal of my residuary estate." If, in the final analysis, there is no residuary estate, Jones will presumably be forced to pursue those to whom property has been distributed in an effort to collect their pro-

portionate share of the taxes. If he is unsuccessful, he will definitely have a problem at that time. At present, however, I think it would be premature to surcharge him in an unknown amount on the assumption that neither the residuary estate nor Ms. Knight will be able to pay her share. This claim for surcharge is denied for this reason.

(8) The exceptants seek a similar surcharge against the executor for the 5 per cent mine interest delivered to Treseder. For the same reason this claim too is denied.

(9) The exceptants point out that since the date of Mrs. deBie's death, Jones, as executor, has taken a total of $324,000 in commissions. Because of the various matters dealt with herein, they ask that he forfeit all such commissions and be surcharged the full amount.

(10) For the same reasons, the exceptants demand that Jones be removed as executor. I am not inclined to grant either of these applications at this time, and I take this position with the following factors in mind.

▆▆▆ Despite the legal complexities it has engendered, the Arundel Mine formed only a small part of Mrs. deBie's overall estate. As pointed out initially, by virtue of her power of appointment over the trust, Faith and Alexis were the income beneficiaries of whatever remained of some $20 million after the payment of state and federal taxes. In addition, there were numerous other problems involved in the administration of the estate which, by and large, Jones handled successfully.

There was tax litigation in the federal district court concerning Mrs. deBie's personal income taxes for 1955–56. As a result, the estate obtained a judgment in its favor of $20,000. A federal claim of over $250,000 for her personal income taxes for 1957–59 was ultimately settled for $57,000. Litigation concerning her expenditures on the mine from 1960–62 involved a federal tax claim for $167,200. The case went to trial in federal district court in Utah, and the government obtained a judgment for only $6,474. Internal Revenue Service also assessed a deficiency against the estate of $1,900,000. This deficiency was eventually compromised for $301,000.

On the local front, litigation took place over the bidding for and the sale of the "Valmy" estate. This litigation went to the Delaware Supreme Court, and Jones, as executor, prevailed. Valmy and Arundel Farm were sold by the executor for a total price in excess of $1 million. The ranch in Nevada was originally appraised for ancillary estate proceedings at a figure in excess of $260,000. Eventually, through the efforts of Jones and Williams, this figure was reduced to $98,500 for the Nevada proceedings, and to $81,000 for federal tax purposes. In addition to the foregoing, Jones has been actively engaged in the management of the estate for some twelve years. He has kept and knows the relevancy of the voluminous records and material amassed during that time.

Even though he may have faltered with regard to his fiduciary duties in the handling and disposition of the mining interests, on balance I am not prepared to conclude that this should automatically deprive him of all credit and compensation for the other matters that he handled properly and successfully for the benefit of the estate. From the evidence, from his demeanor as a witness, and from his prior good reputation and long-standing loyalty to both Mrs. deBie and her mother before her, I am impressed that the legal transgressions of Jones with regard to the mine were not motivated so much by connivance (as suggested by counsel for Faith and Alexis) as they were by a desire to keep his former employer's mine alive as long as possible,

free from any interference from her children as she had wanted, and to hopefully realize something from it for those who had shared Mrs. deBie's interest and enthusiasm for such a speculative venture for so many years during her lifetime. To a certain extent, the same may well be said of Treseder and Hunt. The eagerness to excuse the two children, who were never favorably inclined to the mining venture, from any participation in it, and to keep it in control of those who had worked for Mrs. deBie, appears to me to have been the fatal temptation to which they all succumbed.

Based upon these considerations I do not feel compelled to remove Jones as executor at this point nor to forfeit all commissions heretofore received solely because of the matters dealt with herein. And, because of the complexity and long duration of the open estate, I reach this conclusion despite the language of 30 Del.C. § 1505(c) previously quoted. Rather, I feel that Jones should be given an opportunity to rectify this aspect of his administration in accordance with the findings herein, particularly since, with the withdrawal of Williams as attorney for the estate and the death of Randall, he would appear to be the one person possessed of maximum knowledge and information to bring about an expeditious closing of the estate—provided, of course, that he is still willing to serve.

## V.

In summary, I conclude as follows:

1. Judgment is given in favor of the defendants on the separate claims of Faith and Alexis for the return to them of the specific 20 per cent interests in the mine bequeathed to them by their mother together with the dividends paid on the stock into which such interests were converted.

2. A constructive trust for the benefit of the estate is imposed on the 2,000 shares of Arundel Mining Co., Inc. stock purchased from the estate by Jones, the 2,000 shares purchased by Treseder, the 700 shares purchased by Hunt, the 500 shares purchased by Randall, and the 500 shares purchased by Williams, and they are to be reconveyed to the estate together with the repayment of all dividends received thereon (totalling $114,000) by the aforesaid purchasers less the amount of the purchase price paid. To the extent that this cannot be accomplished, Jones, as executor, shall be surcharged for the difference between the fair value of the stock at the time it was sold by the estate and the $3.70 per share received for it, together with all unrecovered dividends.

3. Judgment shall be entered against the plaintiffs as to all claims against the named defendant Jay Sylvester and the three friends, brother and two sisters of the executor for either the return of the stock purchased by them from the executor, its value over and above what they paid for it, or the dividends received thereon. To the extent that the value of the stock at the time they purchased it may hereafter be determined to have exceeded the $3.70 per share they paid for it, Jones, as executor, shall be surcharged for the difference.

4. Judgment is given against Jones, as executor, in the sum of $131,610.73, on the exceptions taken to the payment of the $50,000 penalty, the $35,000 bequest to himself, and the $46,610.73 Delaware estate tax penalty.

5. Judgment is given in favor of Jones, as executor, on the remaining exceptions for surcharge, without prejudice, however, to the right of the exceptants to seek forfeiture of commissions for matters not dealt with in this litigation, or which may arise hereafter.

6. The application to remove Jones as executor based upon the matters dealt with

in this litigation is denied, without prejudice, however, to the right of the exceptants to renew such application for cause not dealt with herein or which may arise hereafter.

7. Judgment is given in favor of the defendant Howard L. Williams on the third party complaint against him.

8. Costs of this proceeding are assessed against the executor, for which there shall be no indemnification from the estate.

Counsel for the exceptants is directed to prepare, circulate and submit a form of order consistent with these findings, submission to be on notice. Remaining matters will be considered on application of counsel.