DAVID B. LILLY COMPANY, INC.,

v.

G. Robert FISHER; Smith, Gill, Fisher and Butts, a Missouri Professional Corporation; Cadwalader, Wickersham and Taft, A Partnership,

David B. Lilly Company, Inc., Appellant in No. 93–7036,

G. Robert Fisher; Smith, Gill, Fisher and Butts, Appellants in No. 93–7061.

No. 93–7036, 93–7061.

United States Court of Appeals, Third Circuit.

Argued Aug. 30, 1993.

Decided March 16, 1994.

Victor F. Battaglia, (Argued), Francis S. Babiarz, Biggs & Battaglia, Wilmington, DE, for David B. Lilly Co., Inc. appellant in No. 93–7036.

Phebe S. Young, Howard M. Handelman, (Argued), Bayard, Handelman & Murdoch, Wilmington, DE, for G. Robert Fisher; and Smith, Gill, Fisher and Butts, appellants in No. 93–7061.

Stephen E. Herrmann, (Argued), Richards, Layton & Finger, Wilmington, DE, for appellee.

Before: BECKER, NYGAARD and ALITO, Circuit Judges

## OPINION OF THE COURT

NYGAARD, Circuit Judge

In this diversity case, David B. Lilly Company, Inc. sued attorney G. Robert Fisher and the law firms of Smith, Gill, Fisher and Butts, and Cadwalader, Wickersham and Taft for professional malpractice. On December 4, 1991, the district court granted Cadwalader's motion for summary judgment and dismissed the Lilly Co.'s claims against it. The district court held that under either New York law or Delaware law, the relationship between the Lilly Co. and Cadwalader was insufficient to give rise to a duty of care. Additionally, it found that the Lilly Co. would be unable to demonstrate reliance on Cadwalader. On July 27, 1992, the district court granted Cadwalader's motion for summary judgment on Mr. Fisher and Smith, Gill's cross-claims, dismissing them as legally insufficient and time-barred. These two judgments will be affirmed. On December 2, 1992, the district court granted Mr. Fisher and Smith, Gill's motion for summary judgment on the ground that the Lilly Co.'s action was barred by the applicable Delaware statute of limitations. We will reverse this judgment.

## I.

The transaction from which this cause of action arose occurred in December 1983 and January 1984 when the Jordan Company acquired a controlling interest in the Lilly Co., a Delaware corporation wholly owned by David B. Lilly, Sr. The Lilly Co.'s primary business was to manufacture practice bombs under a federal set-aside program. To be eligible under this program, the Lilly Co. had to be a "small business" as defined by applicable federal regulations. Jordan was a private investment partnership comprised of John W. Jordan, David Zalaznick and Leucadia Investors, Inc. Jordan, through Mr. Zalaznick, negotiated with Mr. Lilly to acquire the Lilly Co. stock. Later, Zalaznick retained attorney G. Robert Fisher and the law firm of Smith, Gill, Fisher and Butts, a Missouri corporation, to structure the transaction and draft the necessary documents. Mr. Lilly did not retain separate counsel.

Fisher had recently represented Jordan and its partners in a potential stock acquisition that also involved a small business eligibility issue. Knowing that the Lilly Co. relied on small business set-aside contracts, he was reluctant to render an opinion on its continued eligibility after the proposed acquisition. After discussing with Zalaznick how best to proceed, Fisher contacted David W.

Feeney, a partner at the New York law firm of Cadwalader, Wickersham and Taft, who had worked on several matters for Jordan in the past.

Fisher sent Feeney a letter stating that:

I am writing to you at the request of David Zalaznick of The Jordan Company relative certain issues we are encountering in the acquisition of the stock of the above company.

More specifically, we would like you to review the attached December 1982 balance sheet relative tax structuring. This company is in the business of manufacturing practice bombs (very similar to Accudyne). We are paying approximately $14,500,000 for the stock of the company. With respect to the taxation, I would like you to call Jeb Boucher at The Jordan Company and give him the benefit of your thoughts on writeup possibilities. My own view is that we will encounter the same problems that we did in Accudyne and that the recapture cost cannot be offset by future tax benefits. We need at least your preliminary thoughts on a relatively prompt basis.

In Accudyne, we encountered a "small business set aside" problem discussed in our memorandum of June 9, 1983. Our firm has not had any substantial experience in government contracting and we are not in a position to advise promptly on proper structuring of the stock ownership of the acquiring company to avoid the attribution to the acquired company of the sales and employees of other companies in which The Jordan Company, Leucadia, or the individuals are involved.

Could you please also have someone in your firm examine this company on a preliminary basis and then call me so we can discuss my concerns.

After receiving Fisher's letter, Feeney called Zalaznick to clarify the scope of Cadwalader's role in the Lilly transaction. Feeney was left with the impression that Fisher and his firm were representing Jordan and that Cadwalader's role was limited to reviewing the transaction generally and discussing with Fisher the concerns raised in this letter. Feeney then asked Dudley Clapp, an attor-

ney in Cadwalader's Washington, D.C. office, to review the small business eligibility issue, but not to spend the time or effort that an opinion would require. On December 21, 1983, Clapp sent Feeney a research memorandum discussing the eligibility issue, but they did not forward a copy to Fisher. Indeed, Fisher was not even aware of its existence until 1989. The memorandum neither stated an opinion on the Lilly stock acquisition nor recommended a specific proposed structure. It questioned "whether the inclusion of a large corporation in the owning group negates the classification of the A Company as a small business concern," and concluded only that the inference of control by a large corporation which threatens small business eligibility "can probably be rebutted if certain guidelines are followed." Cadwalader never provided Jordan or Fisher with any formal opinion on the Lilly stock acquisition, nor was it paid for work on the proposed transaction. In total, Clapp billed only 6.17 hours of time on this matter.

Ultimately, Fisher structured the acquisition so that Mr. Jordan and Zalaznick did not control the board and were not operating officers. Mr. Lilly testified during his deposition that Fisher had assured him that the small business eligibility issue had been researched and there was no problem. Similarly, Zalaznick viewed the eligibility question as having been answered by the attorneys; he believed that the transaction had been structured to meet all the rules and regulations. Smith, Gill submitted a bill to Jordan in the amount of $51,620.77 for services rendered, including "research and advice regarding impact of government contracts on structure of acquisition." Jordan remitted a check to Smith, Gill from an account held in the name of Lilly Holdings.

The transaction was structured by forming a new corporation, Lilly Holdings, Inc., which purchased all of the Lilly Co. stock from Mr. Lilly. Fisher incorporated Lilly Holdings, which issued a 70% interest to Jordan, a 20% interest to Mr. Lilly, and a combined 10% interest to William T. Ramsey, the Lilly Co.'s then-President, and David B. Lilly, Jr. Lilly Holdings was then merged back into the Lilly Co. Fisher sent an opinion letter to

Manufacturers Hanover Trust Co., which financed the transaction, stating that he and his firm represented both Lilly Holdings and the Lilly Co. The letter asserted that Lilly Holdings and the Lilly Co. "have the power and authority and the legal right to own and operate their property, to lease the property they operate and to conduct the businesses in which they are currently engaged." Cadwalader was never asked to review the closing documents, nor did it participate in the closing.

Five years later, while the Lilly Co. and Abbott Products, Inc. were competing for a small business contract, Abbott challenged the Lilly Co.'s small business status. When he learned of the problem, Zalaznick faxed a letter to Fisher stating that a competitor had

> filed a complaint alleging that the David B. Lilly Company is not a small business. I'm sure you remember this issue because we addressed it when we bought the company. All the stock is held by individuals, except Leucadia's piece, so no one stockholder has a majority interest. If there is an issue, it would be between Jay, Leucadia and myself being considered a group and whether we had a controlling interest. Since each party acts independently of each other and there are no pre-arrangements with regard to how each party votes its stock, I think we have a decent case. Furthermore, the Board of Directors is controlled by the Management Group.

Mr. Lilly consulted with separate counsel from Arent, Fox, Kintner, Plotkin and Kahn, and he called Fisher and Zalaznick. Coralyn Mann, an attorney with Arent, Fox, stated during her deposition that:

> Mr. Fisher basically admitted that he had given bad advice.... Everyone agreed, and Mr. Fisher did say that his firm had done extensive research that prior week on the issues of SBA [Small Business Administration], had consulted with various other experts in the area and everyone, all the experts including the Fisher people working on it, all the experts that they had consulted and Arent, Fox concluded that there was no chance of winning the size appeal. We had no credible argument.

According to Matthew Perlman, another Arent, Fox attorney, "Fisher was very up front about his role in the problem, and he indicated that he had given the advice that there was no small business problem. He did mention that he had talked to the Cadwalader, Taft law firm about the matter."

The Lilly Co. then decided to withdraw its bid on the pending solicitation, and Fisher and one of the Arent, Fox attorneys drafted a letter to the SBA, stating that:

> Lilly Co. has decided to withdraw its proposal on the subject structure designed to eliminate any potential affiliation issues. Such actions render the subject protest moot and we request that the protest be dismissed on this basis.
>
> This decision notwithstanding, we wish to make abundantly clear that Lilly Co.'s certifications of its small business status have always been made in good faith. When certain of the Lilly Co. stock was sold to other investors, the issue of its small business status was addressed, and, the Lilly Co. understood through advice of its counsel that its small business status would be unaffected by the introduction of passive investors to the company. Since its small business status has now been questioned, the Lilly Co. intends immediately to take whatever action it deems appropriate to eliminate any doubt that it is a small business.

The Lilly Co. then made appropriate changes to meet small business eligibility standards and filed this legal malpractice action against Fisher and Smith, Gill in the District of Delaware. It alleged damages which included income lost when it withdrew its bid as well as the costs of restructuring. The Lilly Co. later added Cadwalader as a defendant, and Fisher and Smith, Gill asserted cross-claims against Cadwalader. The district court exercised diversity jurisdiction under 28 U.S.C. § 1332, and we exercise appellate jurisdiction under 28 U.S.C. § 1291. We review the evidence *de novo* and apply the same tests applicable in the district court. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1530 (3d Cir.1990).

## II.

### A.

■ Both the statute of limitations and liability issues raised in this appeal require that we first determine what state's law should apply. We have stated that "[a] federal court, sitting in diversity, follows the forum's choice of law rules to determine the applicable statute of limitations." *Ross v. Johns–Manville Corp.*, 766 F.2d 823, 826 (3d Cir.1985) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)). Therefore, we must look to Delaware law. Although the Delaware Supreme Court has adopted the most significant relationship test set forth in the Restatement (Second) of Conflict of Law § 145(1) (1971) for analyzing choice of law questions relating to tort claims, *see Travelers Indem. Co. v. Lake*, 594 A.2d 38, 40 (Del.1991), it has not explicitly adopted section 142 of the Restatement which governs the statute of limitations.[1] Moreover, the Delaware borrowing statute provides that: "Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply." Del.Code Ann. tit. 10, § 8121 (1975); *see also Pack v. Beech Aircraft Corp.*, 132 A.2d 54, 57 (Del.1957) (asserting that borrowing statute does not alter the common law *lex fori* rule for residents). Because the Lilly Co. was a Delaware resident during the relevant time period, the Delaware borrowing statute dictates that its three-year limitations period applies. *See* Del.Code Ann. tit. 10, § 8106 (1975); *Began v. Dixon*, 547 A.2d 620, 623 (Del.Super.Ct.1988) (reaffirming that legal malpractice actions are governed by Delaware's three-year statute of limitations).

■ Under Delaware law, the statute of limitations generally "begins to run at the time of the wrongful act, and, ignorance of a cause of action, absent concealment or fraud, does not stop it." *Isaacson, Stolper & Co. v.*

*Artisan's Sav. Bank*, 330 A.2d 130, 132 (Del. 1974) (citing *Mastellone v. Argo Oil Corp.*, 82 A.2d 379 (Del.1951)). However, in *Layton v. Allen*, 246 A.2d 794 (Del.1968), a medical malpractice case, the Delaware Supreme Court established a time of discovery exception. It held that:

> [W]hen an inherently unknowable injury . . . has been suffered by one blamelessly ignorant of the act or omission and injury complained of, and the harmful effect thereof develops gradually over a period of time, the injury is "sustained" . . . when the harmful effect first manifests itself and becomes physically ascertainable.

*Id.* at 798. Outside a medical malpractice context, this exception is "narrowly confined . . . to injuries which are both: (a) 'inherently unknowable'; and (b) sustained by a 'blamelessly ignorant' plaintiff." *Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 835 (Del.1992) (citations omitted); *see also Isaacson, Stolper & Co.*, 330 A.2d at 133 ("Application of the 'time of discovery' rule is limited, and each case must stand or fall on its own facts").

■ The injury alleged here involves the failure by Fisher and Smith, Gill (the "Fisher defendants") to structure the Lilly acquisition so as to preserve the Lilly Co.'s small business eligibility. In *Isaacson, Stolper & Co. v. Artisan's Savings Bank*, 330 A.2d 130 (Del.1974), the Delaware Supreme Court held that a party's cause of action for negligent accounting did not accrue until it had received a letter from the IRS notifying it of a tax deficiency. *See id.* at 133–34. The court reasoned that the relationship between plaintiff and defendant "was one of confidence and reliance by plaintiff on the expertise of defendant, not only in the field of general accounting, but also as to tax problems involved." *Id.* at 133. Our situation is identical. The Lilly Co. depended on the Fisher defendants' legal skills to maintain its

---

1. The 1989 revision of section 142 aligns choice of law questions relating to statute of limitations with other choice of law questions. Restatement (Second) of Conflict of Laws § 142 (1989); *see*

*also Warner v. Auberge Gray Rocks Inn, Ltee.*, 827 F.2d 938, 942–43 (3d Cir.1987) (discussing movement towards applying the most significant

small business eligibility.[2] In *Kaufman v. C.L. McCabe & Sons, Inc.,* 603 A.2d 831 (Del.1992), the Delaware Supreme Court held that the time of discovery rule did not apply to a cause of action for negligent procurement of insurance coverage. *Id.* at 835. *Kaufman,* however, is distinguishable because terms in an insurance policy are discoverable by a lay person who can simply read the policy. In contrast, a failure to satisfy the legal requirements for small business status is analogous to a medical injury or condition. Both are "inherently unknowable" to a lay person.

The district court focused on Zalaznick's role in the acquisition and concluded that the Lilly Co., as Jordan's corporate successor, was not a "blamelessly ignorant" plaintiff. We consider the concepts of knowability and blameless ignorance in a legal malpractice claim to be analytically intertwined. For example, the plaintiffs in *Kaufman* had argued that they were blamelessly ignorant because they relied on the defendant's professional expertise, but the court reasoned that they "cannot reasonably claim to be blamelessly ignorant of the terms of a policy of which they had notice and constructively accepted." *Id.* at 835; *see also Hodges,* 517 A.2d at 301 (linking blameless ignorance with absence of observable or objective factors). The very nature of this complicated legal issue calls for analysis by legal professionals. Indeed, legal consumers rely on a lawyer's expertise precisely because they need answers beyond their lay knowledge.

The time of discovery exception ameliorates the harshness of precluding a legal action "before the plaintiff was aware that anything was wrong or had any reason to be aware of the difficulty." *Rudginski,* 378 A.2d at 649. Here, the Lilly Co. relied on the Fisher defendants' advice regarding the critical issue of small business eligibility. It

had no actual knowledge and was blamelessly ignorant of its ineligibility until five years after the transaction had closed. These facts about the nature of the injury and the Lilly Co.'s lack of knowledge are clear. Hence, it is not necessary that we remand for further fact finding. We hold that the time of discovery exception applies and that the Lilly Co.'s cause of action is not barred by the statute of limitations.

### B.

 Although the Fisher defendants have stipulated that Delaware law applies to the Lilly Co.'s claims against them, the parties vigorously dispute which law applies to the claims against Cadwalader. A federal court sitting in diversity applies the choice of law rules of the state in which it sits, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), and we thus turn to Delaware law. The Delaware Supreme Court, in *Travelers Indemnity Co. v. Lake,* 594 A.2d 38 (Del. 1991), adopted the Restatement's most significant relationship test for choice of law questions arising in tort cases. *Id.* at 47. Section 145 of the Restatement provides that:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the injury occurred,

relationship test to statute of limitations questions).

**2.** *See also Hodges v. Smith,* 517 A.2d 299, 301 (Del.Super.Ct.1986) (action for negligent survey accrued when plaintiff discovered error); *Pioneer Nat'l Title Ins. Co. v. Sabo,* 382 A.2d 265, 268 (Del.Super.Ct.1978) (action for negligent title survey accrued when plaintiff was notified of error); *Rudginski v. Pullella,* 378 A.2d 646, 649

(Del.Super.Ct.1977) (action for negligent installation of septic tank accrued when plaintiffs learned of defect); *Child, Inc. v. Rodgers,* 377 A.2d 374, 377 (Del.Super.Ct.1977) (action for negligent title search accrued when plaintiffs became aware of loss), *aff'd in part and rev'd in part sub nom. Pioneer Nat'l Title Ins. Co. v. Child, Inc.,* 401 A.2d 68 (Del.1979).

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971). Section 6 of the Restatement lists the following considerations:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* § 6(2).

The factors enumerated in sections 145 and 6 should be evaluated on a qualitative rather than a quantitative basis. *See Lake,* 594 A.2d at 48 n. 6. Since these two sections of the Restatement address overlapping concerns, we will analyze the more factually based contacts of section 145 in conjunction with the more policy-oriented principles of section 6. Hence, our discussion of where the injury occurred is related to our appraisal of the forum's relevant policies and basic tort policies. Similarly, our review of where the conduct occurred raises the factor of the relevant policies of other interested states. Although we "are not bound to decide all

issues under the local law of a single state," Restatement (Second) of Conflict of Laws § 145 cmt. d (1971), our assessment of the center of the relationship between the parties is the cornerstone of our analysis. *See id.* § 145(2)(d). The remaining factors are of lesser importance. No single state is the place of business for all the parties,[3] and in a tort action, as opposed to a contract or property action, the parties' expectations and the premium on certainty and predictability provide weaker rationales for applying a particular state's law. *See id.* § 145 cmt. b; *id.* § 6 cmt. g. The needs of the interstate system and the ease in determining and applying the law are also relatively neutral considerations in this case.

The place where the injury occurred is Delaware which is also the center of the web of relationships between the parties. Although the post-acquisition corporate structure was established in New York when the transaction closed, the Lilly Co. was not injured until its small business deficiency was discovered.[4] Delaware has an interest in compensating victims for injuries resulting from legal malpractice and provides a cause of action for such injuries. *See Pusey v. Reed,* 258 A.2d 460, 461 (Del.Super.Ct.1969). Moreover, Delaware has a particular stake in protecting its legal consumers from negligent attorneys when the resulting injury occurs in Delaware. "[A] state has an obvious interest in regulating the conduct of persons within its territory and in providing redress for injuries that occurred there." Restatement (Second) of Conflict of Laws § 145 cmt. d (1971). The basic policy underlying an action for professional negligence, to compensate the victim, further supports Delaware's interest as the state where the injury occurred and the plaintiff does business. *See id.* § 145 cmt. c; *DeAngelis v. Harrison,* 628

3. The Lilly Co. is a Delaware corporation based in Delaware; Cadwalader is a New York partnership with offices in New York and Washington, D.C.; Smith, Gill is a Missouri corporation based in Kansas City; and Mr. Fisher is a Kansas citizen licensed to practice law in Missouri.

4. We note that the concept of an "injury" has different nuances in the context of a choice of law analysis as opposed to a statute of limitations analysis. For example, under Delaware law,

plaintiffs alleging negligent procurement of insurance coverage need not wait until an uncovered loss occurs before filing suit. Their cause of action accrues and the limitations period begins to run once the erroneous coverage is procured. *See Kaufman,* 603 A.2d at 834. Here, however, the Lilly Co.'s allegation of damages includes the cost of restructuring *and* the loss stemming from its withdrawn bid, which occurred after its flawed structuring had been discovered.

A.2d 77, 81 (Del.1993) (asserting that purpose of damages in a tort action is compensation); *cf. Jardel Co. v. Hughes,* 523 A.2d 518, 529 (Del.1987) (reasoning that mere negligence does not warrant punitive damages which serve to punish and deter).

With respect to the locus of the offending conduct, Cadwalader maintains that its alleged advice was "sought and rendered" from its New York office. However, the record shows that Clapp, who worked in Cadwalader's Washington, D.C. office, was responsible for doing the actual research on small business eligibility. Additionally, the Fisher defendants, who structured the transaction, were located in Missouri. The alleged negligence thus was committed by attorneys whose legal services originated in other states. As a practical matter, however, these services were rendered in Delaware. Although a state has an obvious interest in regulating the conduct of its own licensed professionals, this interest is not dispositive.[5] Our task is to determine which state has the most significant relationship to the occurrence and parties in light of all the relevant principles. *See* Restatement (Second) of Conflict of Laws § 6 cmt. f (1971) ("state whose interests are most deeply affected should have its local law applied").

The relational strands between the parties in this lawsuit span several states. The Fisher defendants, based in Missouri, structured the acquisition of the Lilly Co., a Delaware corporation. They merged the Lilly Co. with a newly created Delaware corporation, and the surviving corporation then continued its operations in Delaware. Thus, the Fisher defendants' relationship with the Lilly Co. was clearly centered in Delaware. Cadwalader, on the other hand, was initially contacted in New York by Mr. Fisher. Thereafter, Cadwalader dealt primarily with the Fisher defendants who argue that District of Columbia law should apply to their cross-claims against Cadwalader. Although the center of Cadwalader's relationship with the Lilly Co. is less clear, the entire web of relationships between the Lilly Co., the Fisher defendants and Cadwalader is centered in Delaware. Cadwalader's input foreseeably resulted in the flawed structuring of a Delaware corporation, and the purpose of the relationship between Cadwalader and the Fisher defendants was to facilitate the acquisition of a Delaware corporation. We conclude that New York and Washington, D.C. have little relationship to either the alleged legal malpractice or the parties, and that Delaware has the most significant relationship to both. Accordingly, we hold that Delaware law should apply both to the Lilly Co.'s claims and the Fisher defendants' cross-claims.

C.

Turning now to the merits, the Fisher defendants argue that even if the Lilly Co.'s claims against them are not time-barred, the district court's judgment should be affirmed because they owed no duty to the Lilly Co. In Delaware, a plaintiff pursuing a legal malpractice claim generally must prove: "[1] the employment of the attorney and [2] the attorney's neglect of a reasonable duty, as well as [3] the fact that such negligence resulted in and was the proximate cause of loss to the client." *Pusey,* 258 A.2d at 461 (citations omitted). The Lilly Co. asserts that its cause of action against the Fisher defendants is derived from both its pre-merger claims and those of Lilly Holdings. *See* Del.Code Ann. tit. 8, § 259 (1991); *Blasband ex rel. Danaher Corp. v. Rales,* 772 F.Supp. 850, 857 (D.Del.1991) ("cause of action belonging to a merged corporation passes to the surviving corporation"), *vacated on other grounds,* 971 F.2d 1034 (3d Cir. 1992).

The Fisher defendants counter that the pre-merger Lilly Co. was not a party to the acquisition, but rather a commodity pur-

---

**5.** *See Crossland Sav. FSB v. Rockwood Ins. Co.,* 692 F.Supp. 1510, 1512 (S.D.N.Y.1988) (concluding that a state's interest in regulating conduct within its borders outweighs another state's interest in regulating its licensed professionals); *cf. Mikropul Corp. v. Desimone & Chaplin–Airtech, Inc.,* 599 F.Supp. 940, 942 (S.D.N.Y.1984) (recognizing a state's interest in insuring that its licensed professionals comply with its standard of care); *Greenlee v. Board of Medicine,* 813 F.Supp. 48, 55 (D.D.C.1993) (recognizing public interest in state licensure of health care professionals).

chased by Lilly Holdings from Mr. Lilly. An opinion letter prepared by the Fisher defendants contradicts this contention. The letter, directed to Manufacturers Hanover Trust, states that the Fisher defendants represent Lilly Holdings and the Lilly Co. "in connection with the execution and delivery of the Credit Agreement ... pursuant to which the Banks have agreed to make loans to the [Lilly] Company for the purpose of financing the merger." Additionally, the Fisher defendants referred to the Lilly Co. as a client in some internal records, and stated in a letter to the SBA that:

Lilly Co.'s certifications of its small business status have always been made in good faith. When certain of the Lilly Co. stock was sold to other investors, the issue of its small business status was addressed, and, the Lilly Co. understood *through advice of its counsel* that its small business status would be unaffected by the introduction of passive investors to the company.

(emphasis added.)

The relationship between the pre-merger Lilly Co. and the Fisher defendants was not a textbook attorney-client relationship. Indeed, Mr. Lilly testified during his deposition as follows:

Q: Okay. You said that it was your opinion your impression that Mr. Fisher was representing David B. Lilly Inc. prior to the merger of 19 January of '84?

A: That's right.

Q: And how is it that he was retained?

A: Well, he was retained by the Jordan Company or he was associated with the Jordan Company as an attorney. In conversations with Mr. Zalaznick [sic] said our attorney has all the boilerplate for this.... Now, my thought was rather than me go out and hire another attorney, duplicate the work that Mr. Fisher was doing based on the fact the deal, the whole deal had to be satisfactory to both parties, ... that there was no point in my going out and spending money to employ another attorney and duplicate the work Mr. Fisher was supposed to be doing.

Nevertheless, Mr. Lilly asserted that he understood that Fisher was doing the legal work for Jordan *and* the Lilly Co. According-

ing to Mr. Lilly, "Mr. Fisher assured me that at that time that there was no question. He had researched it. There was no question but what [sic] we would remain a small business or our small business status would not be changed."

During his deposition, Fisher also admitted that Mr. Lilly wanted him to resolve the small business eligibility issue:

A: During the period that we were, we wanted to get comfort on the structuring of the deal. We were talking—David Anderson [Mr. Lilly's personal lawyer] told me he was not an SBA expert. And David Lilly seemed not to want to get Anderson involved any more than he had to, so he said not to expect to get any help from him. He kind of wanted me to do it. I mentioned Arent, Fox because we were talking to them about the assignability issue. He said, "They're government contract lawyers. They're not SBA lawyers." ... He kept pushing that issue back to me to get it resolved.

Later, however, when asked whether he at any time represented the pre-merger Lilly Co., Fisher answered "No." The Fisher defendants' legal duty to the pre-merger Lilly Co. depends on the scope and nature of their relationship, which is manifestly a matter of genuine dispute. Did the pre-merger Lilly Co. rely on the Fisher defendants? Did the Fisher defendants foresee that reliance? Is the Lilly Co. a third-party beneficiary of the agreements? Did the Fisher defendants assume the duty of representing the Lilly Co.? Were the Fisher defendants retained to render advice on the small business issue? The answers to these questions, at a minimum, depend upon material facts which remain at issue. Because the Lilly Co.'s claims are not time-barred and the extent of the Fisher defendants' legal duty is unclear, we will vacate the district court's summary judgment in favor of the Fisher defendants. Finally, we note that the Fisher defendants' legal duty to Lilly Holdings provides an additional potential basis for the Lilly Co.'s cause of action.

**D.**

 The district court granted summary judgment against the Lilly Co. and for

Cadwalader on the grounds that the Lilly Co. could not establish proximate cause and Cadwalader owed no duty of care to the Lilly Co. In a legal malpractice action, "the client has the burden of proving that the misconduct was a proximate cause of injury, and the fact and extent of the injury alleged." *Thompson v. D'Angelo*, 312 A.2d 639, 640 (Del.Super.Ct.1973), *aff'd*, 320 A.2d 729 (Del.1974). In *Pusey v. Reed*, 258 A.2d 460 (Del.Super.Ct.1969), the court explained that a party alleging legal malpractice based on negligence in connection with a litigation usually must prove that *"but for* the negligence complained of, the client would have been successful in the prosecution or defense of the action in question." *Id.* at 461 (emphasis added). Similarly, in *Vredenburgh v. Jones*, 349 A.2d 22 (Del.Ch.Ct.1975), the court concluded that an attorney's advice was not always the proximate cause of the defendant's liability even if the defendant had acted in reliance on that advice. *Id.* at 41. The *Vredenburgh* court reasoned that:

> While an attorney has an obligation to give his client the best possible advice based upon the situation as he views it and the information supplied or made available by the client, he should not be made the insurer of his client if, through no fault of his own, he is unaware of all information possessed by his client and those working in conjunction with him.

*Id.* The issue here is whether Cadwalader's actions were the proximate cause of the Lilly Co.'s alleged loss.

One theory is that the Lilly Co. relied on Cadwalader through the Fisher defendants' reliance on Cadwalader—a transitive reliance. The Lilly Co. itself was not aware of Cadwalader's role in the acquisition transaction until after it discovered its small business deficiency. Fisher attested during his deposition that "our firm had retained the Cadwalader firm on behalf of the company to advise us on the SBA issue and that the Cadwalader firm had given us certain advice and that we had relied on it." The parties' most substantive conversation about the small business issue occurred during a conference call. Notes taken by a Cadwalader attorney during this call reflect Cadwalader's

knowledge of the potential problem: "Will Lilly still qualify as a small business concern." These notes, however, also indicate that during the conference call, Cadwalader discussed "safe" structuring options. Moreover, Feeney specifically raised the concern that if Mr. Jordan and Zalaznick owned a controlling interest, then their affiliates could jeopardize the post-merger Lilly Co.'s small business status, but Fisher preferred to make the argument that the Jordan Company's partners were independent and did not share control of the Lilly Co. In its brief, the Lilly Co. itself asserts that "Fisher ignored Cadwalader's substantive comments for structuring the transaction safely." Indeed, the conference call notes indicate that Fisher said he preferred to fix the problem when it comes up.

It is undisputed that Cadwalader was asked to examine the company "on a preliminary basis" and that it never prepared an opinion letter on the small business issue or collected any payment for its work on the proposed transaction. Cadwalader had, at best, a limited role in the transaction structuring. Furthermore, given Lilly's assertion of reliance on the Fisher defendants, Cadwalader's alleged negligence was not the "but for" cause of Lilly's injury. The Fisher defendants did not insist on an opinion letter, and they disregarded the limited advice Cadwalader gave them during the January 16, 1984 conference call. We agree with the district court that Cadwalader's advice simply was not the proximate cause of Lilly's injury.

We have recognized that privity requirements generally protect an attorney from liability to third parties, but that "the law recognizes several limited situations in which an attorney can be held liable to non-client third parties." *Harad v. Aetna Casualty & Sur. Co.*, 839 F.2d 979, 983 n. 5 (3d Cir.1988). Thus, that Lilly did not formally retain Cadwalader does not end the inquiry into Cadwalader's duty. *See Hodges*, 517 A.2d at 301 (approving "extension of liability to foreseeable plaintiffs under these allegations of a survey error"). Nonetheless, we do not reach the question of duty because our holding on proximate cause is dispositive.

E.

■■■ Finally, in their cross-claims, the Fisher defendants assert that Cadwalader is liable for contribution as a joint tortfeasor or, in the alternative, liable for indemnification as the party primarily responsible. Contribution, however, is available "only when the proposed contributor shares with the defendant a 'common liability' to the plaintiff. Absent such liability, no contribution may be enforced." *Mumford v. Robinson*, 231 A.2d 477, 478 (Del.1967) (quoting *Fields v. Synthetic Ropes, Inc.*, 59 Del. 135, 215 A.2d 427, 430 (1965)); *see also Rigsby v. Tyre*, 380 A.2d 1371, 1373 (Del.Super.Ct.1977) (asserting that contribution is only available from a tortfeasor against whom a third person has an enforceable cause of action). Similarly, a tort claim for indemnification "arises where two people commit a tort or wrong which hurts the same person." *Rock v. Delaware Elec. Coop., Inc.*, 328 A.2d 449, 452 (Del.Super.Ct.1974). Because we conclude that summary judgment is proper on the Lilly Co.'s claims against Cadwalader, we also will affirm the district court's summary judgment on the Fisher defendants' cross-claims.

III.

In sum, we will affirm the order of December 4, 1991, granting summary judgment in favor of Cadwalader on the Lilly Co.'s claims, the order of March 26, 1992, denying reconsideration, and the order of July 27, 1992, granting summary judgment in favor of Cadwalader on the Fisher defendants' cross-claims against it. We will, however, vacate the summary judgment granted on December 2, 1992, in favor of the Fisher defendants on the Lilly Co.'s claims, and the order of January 11, 1993, denying reconsideration, and remand the cause to the district court.